### UNITED STATES v. LANTRIP.
Cr. No. 14713.

District Court, E. D. Arkansas, W. D.
Jan. 13, 1948.

James T. Gooch, U. S. Atty., and W. H. Gregory, Asst. U. S. Atty., both of Little Rock, Ark., for the Government.

Sam Robinson, of Little Rock, Ark., for defendant-movant.

LEMLEY, District Judge.

The defendant, Ernest Lantrip, has been charged by the Grand Jury for the Eastern District of Arkansas in an indictment containing three counts with (1) on or about March 25, 1947, unlawfully possessing a still designed for use in the production of spirituous liquors without having the same registered as required by law, 26 U.S.C.A. Int.Rev.Code, § 2810, and (2) with having at the same time engaged in and carried on the business of a distiller of spirituous liquors without having given bond as required by law, 26 U.S.C.A. Int. Rev.Code, § 2833, and (3) with having at the same time and place unlawfully made and fermented 150 gallons of mash intended for use in the distillation and production of spirituous liquors on premises other than a distillery duly authorized by law, 26 U.S.C.A. Int.Rev.Code, § 2834.

The defendant has moved the court to direct that one 55-gallon iron drum still pot, one 50-gallon wooden barrel, one worm, two 50-gallon mash barrels, 18 gallons of distilled spirits, two 10-gallon kegs, 150 gallons of mash, and certain other property, of which he is the owner, and all of which he contends was unlawfully seized and taken by certain investigators of the

Alcohol Tax Unit of the Treasury Department of the United States, be suppressed as evidence against him in this proceeding, on the ground that the same was taken from his home against his will and without a search warrant. The Government admits that this property was seized and taken from the defendant's curtilage without a search warrant, but contends that he consented to the search.

A hearing has been had on this motion, and counsel for both sides have submitted written briefs.

The proof in substance is as follows:

Investigators John H. Greeley and Harry E. Brill of the Alcohol Tax Unit received information to the effect that an illicit still was being operated on the Lantrip place in Pulaski County, Arkansas. A part of this place is owned by the defendant and a part by his mother. The offices of these investigators are within one block of that of a United States Commissioner in Little Rock, but no effort was made to obtain a search warrant. On the other hand, they proceeded immediately to make a search of the Lantrip property. They first searched the fields, and finding no evidence of the still, they then searched Lantrip's mother's house. She testified that this was done without her consent. The officers testified that she agreed to the search. No incriminating evidence was found in this home. The officers stated that a still had been set up there but had been moved. They then proceeded to the home of the defendant. One of the officers pulled his badge from his pocket and exhibited it to Lantrip and told him that they were federal officers and were investigating a report that he was making whiskey there. The Government contends that Lantrip then consented to a search of the premises. Lantrip and his wife have testified to the contrary. In any event, the officers found and took from the defendant's barn, which was within his curtilage, the property which forms the subject matter of this motion.

We will quote from the testimony of the officers:

Officer Brill—Direct Examination:

"Q. Mr. Brill, at this time there is a motion before the Court that on the 25th day of March, 1947, you made an investigation on the premises of one Mr. Ernest Lantrip. Will you state to the Court in detail exactly what happened, Mr. Brill? A. On that day, Investigator Greeley and I were investigating a report that there was an illicit liquor manufacture and sale on the Lantrip property, and we went to the home of Ernest Lantrip. We went to the door and Mr. Lantrip met us at the door. Mr. Greeley told him that we were federal officers and had a report that he was making whiskey there. He said, 'There is nothing to that at all; there's nothing like that around here, no still.' He said, 'You can go ahead and look if you want to; look any place. Come right in the house if you want to; start here and look.' So, Mr. Greeley told him, no, we didn't care to go into the house but we would like to look over the outbuildings. So I stood and talked to Mr. Lantrip and his wife and Mr. Greeley started out toward the shed, forty or fifty yards north of the house in a field there; and as he was nearing this shed, Mr. Lantrip said to me, 'There's no use to lie about it any more, he is going to it.' He said, 'It's out there in that shed; I have got a still out there.' So I placed him under arrest and went out to where Mr. Greeley was and we found the still in the shed and two barrels of mash and about eighteen gallons of whiskey. It was untaxed whiskey."

Officer Greeley—Direct Examination:

"Q. Will you state to the Court exactly what took place from the time that you arrived at Mr. Lantrip's premises until he was apprehended. A. We arrived there about the middle of the afternoon and went to the back door, the east door. The door was open. As I stepped up on the porch step, Mr. Lantrip got up from the table—he was eating—and came to the door. I said, 'My name is Greeley and this is Mr. Brill. We are Investigators of the Alcohol Tax Unit and have reports that you are violating the liquor laws here on these premises.' I did show him my badge at that time. He said, 'Well, go ahead and look any place you want to look.' He said, 'Do you want to look in the house,' and I said, 'No, just outside,' and started to the shed about forty or fifty yards on the edge of a field. Mr. Brill hollered at me and said, 'He said it's in there.'

948

"Q. What did you find there? A. The still was dismantled. We found two fifty-gallon barrels of mash and about eighteen gallons of whiskey in the shed.

"Q. After you went on down to the shed, did Mr. Lantrip and Mr. Brill come on down there? A. Yes, sir, they did.

"Q. They came on down there to the shed with you? A. Yes, sir."

Officer Greeley—Cross Examination:

"Q. You had no search warrant? A. No search warrant, no.

"Q. And no warrant of arrest? A. No warrant of arrest.

"Q. And you went out there for the purpose of making a search? A. That's right, yes, sir.

"Q. Your offices are within one block of the U. S. Commissioner's office? A. That's right.

"Q. You did not attempt to secure a search warrant? A. No.

"Q. Prior to the time you went out there you had information to the effect that the defendant had liquor there or was engaged in the making of liquor? A. That he was in the liquor business, yes, sir.

"Q. Did you consider that information reliable? A. Yes, sir.

"Q. At least you considered it reliable enough to where you went up to make a search? A. That's right.

"Q. But you didn't even attempt to secure a search warrant? A. That's right. * * *

"Q. I believe you said that you did tell him that you were United States officers? A. That's right, yes, sir.

"Q. And you did show him your badge? A. I did, yes, sir.

"Q. You had a badge in your pocket that you pulled out and showed him? A. That's right. * * *

"Q. At the time you went out there to this man's house, to his curtilage—you are familiar with that term? A. Yes, sir.

"Q. You have learned that in your long experience as an officer? A. Yes, sir.

"Q. Your are familiar with that term and with the law on that point, that you can only make a search where the wrong is being committed in your presence or where the man gives his consent? A. Yes, sir.

"Q. You knew that when you went out there? A. Yes, sir.

"Q. You knew that you would have no right to search the premises, and I mean the house and surroundings, the curtilage, unless he gave his consent? A. That's right.

"Q. And regardless of the fact that you were fully acquainted with the law on that subject you made no attempt to get a search warrant? A. That's right.

"Q. You relied entirely upon being able to secure the consent of· the person? A. That's. right.

"Q. What did you do by way of trying to secure the consent? A. Told him that we had reports that he was violating the liquor laws on the premises and he said, 'Go ahead and look around, any place you want to look,' and said, 'Do you want to go in the house?' and I said, 'No, just on the outside.'

"Q. You showed him your badge? A. Yes, sir.

"Q. Being an officer of many years' experience, you knew that by showing him that badge that was going to coerce him into not resisting at all, did you not? A. Well, now, I knew that that's possible.

"Q. You know from your long experience as an officer that practically everybody, even those engaged in violating the law, have respect for the federal officers? A. Yes, sir.

"Q. And are not likely to do anything that could be construed as resisting an officer? A. Yes, sir.

"Q. You know that to be a fact, do you not? A. Yes, sir." * * *

Officer Greeley—Examination by the Court:

"Q. I would like to ask a question: What is your custom, when you have reports, or reason to believe, that a man is violating the law within his curtilage; what is the custom? A. We seldom secure search warrants.

"Q. How long has it been since you secured a search warrant? A. Oh, I don't believe that I have secured a search war-

rant or helped execute a search warrant in fifteen years."

As we have indicated, the defendant and his wife deny that he in any respect assented to the search and seizure. We find from the evidence, nevertheless, that the officers went to the defendant's home; they told him that they were federal officers and that they had information to the effect that the law was being violated on his premises; one of the officers removed his badge from his pocket and exhibited it to the defendant, and stated that they would like to search his premises; and the defendant said: "Go ahead," or words to that effect. The question, however, is whether or not, under this evidence and all the circumstances of the case as analyzed, weighed and construed by the Court, the words and actions of the defendant constituted such a consent on his part as to amount to a waiver of his constitutional rights. We think not. In our judgment, they, on the other hand, should be attributed to a peaceful submission to the officers of the law; that is to say, the defendant acquiesced in the search rather than consented thereto.

The case of United States v. Slusser, D.C.S.D.Ohio, W.D., 270 F. 818, 819, is in point. In the Slusser case two prohibition officers and two city policemen went to the defendant's residence, knocked, and were admitted. One of the officers displayed his badge and said that they were there to search for liquor. Slusser said: "All right; go ahead." Certain bottles of whiskey were found. The officers had no search warrant. The court held the search to be an illegal one, and that the so-called consent given by Slusser did not amount to a waiver of his constitutional rights, but, on the contrary, should be attributed to a peaceful submission to officers of the law.

In the Slusser case, one of the agents displayed his badge and said that they were officers and were there to search for liquor. In the instant case, one of the officers made a display of his badge and informed Lantrip that they had information to the effect that he was making liquor on his premises and would like to search therefor, to which

Lantrip in effect gave the same reply as did Slusser. In the Slusser case the officers stated that they were there to search for liquor. It was of course evident to Lantrip that the officers were at his home for the same purpose. Lantrip is an unlettered man, and it is patent to the court that he did not know what his constitutional rights were under the circumstances. One of the officers testified that in 15 years' service he had never made a search of a man's home under the sanction of a search warrant.

For other decisions in line with the Slusser case, see Amos v. United States, 255 U. S. 313, 41 S.Ct. 266, 65 L.Ed. 654; United States v. Marra et al., D.C.W.D.N.Y., 40 F. 2d 271; United States v. Hoffenberg, D.C. E.D.N.Y., 24 F.Supp. 989; United States v. Sully, D.C.S.D.N.Y., 56 F.Supp. 942; Karwicki v. United States, 4 Cir., 55 F.2d 225.

The search here cannot be justified by what was found. In the recent case of United States of America v. Michael Di Re, 68 S.Ct. 222, 229, that Court used the following language: "We have had frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success."

In the last cited case, the Supreme Court also said: "We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them. The conviction based on evidence so obtained cannot stand."

The motion to suppress is granted.