UNITED STATES, Appellee

v

COLEY JUSTICE, JR., Platoon Sergeant, U. S. Army, Appellant

13 USCMA 31, 32 CMR 31

No. 15,247

April 20, 1962

*Captain Richard A. Baenen* argued the cause for Appellant, Accused. With him on the brief were *Colonel W. H. Blackmarr, Captain Ralph T. Smith,* and *First Lieutenant Robert D. Stiles.*

*Captain Alvin B. Fox* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy, Major Francis M. Cooper,* and *First Lieutenant Jerome Nelson.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial in Germany convicted the accused of the rape of his six-year-old stepdaughter and of assault with a means likely to produce grievous bodily harm, in violation of Articles 120 and 128, respectively, of the Uniform Code of Military Justice, 10 USC §§ 920, 928. It sentenced him to a dishonorable discharge, confinement at hard labor for life and accessory penalties. On intermediate appellate review the findings of guilty were affirmed, but the period of confinement was reduced to twenty-five years. Here, the accused contends that two rulings by the law officer constitute reversible error.

We turn first to the admission of certain evidence obtained as a result of three separate searches of the accused's apartment. The evidence consisted of a child's aluminum baton, bloodstained pillow cases and bed sheets, and the location of blood spots in the apartment. The defense objected to the admission of the evidence on the ground that the searches were not authorized and the accused did not consent thereto. See United States v Alaniz, 9 USCMA 533, 26 CMR 313. With the Government specifically disclaiming any "grounds for search" other than consent, the law officer ruled the evidence admissible.[1]

When consent to a search is asserted,

---

[1] There is evidence to indicate that the second search was specifically authorized. Thus, one of the agents who conducted the second search said that on that occasion he was accompanied by the accused's commanding officer. It also appears that with the exception of the baton which was obtained during

it must be shown by "clear and positive testimony." United States v Berry, 6 USCMA 609, 20 CMR 325. The burden of proof is upon the Government. It is an especially heavy obligation if the accused was in custody at the time he purportedly gave his consent. Judd v United States, 190 F2d 649 (CA DC Cir) (1951); United States v Wallace, 160 F Supp 859 (DC) (1958), cited with approval in United States v Alaniz, supra. Mere submission to the color of authority of law enforcement officers, or acquiescence in the officers' announced or indicated purpose to search, is not consent. It would certainly lessen the frequency of dispute and ease the burden of decision if law enforcement agents made crystal clear to persons whose premises are to be searched that they have no official authorization, and that they cannot search in the absence thereof, unless they have free and knowing consent to enter into and search the premises. United States v Whitacre, 12 USCMA 345, 347, 30 CMR 345. Specificity of such advice and consent is, however, seldom found. Each case must be decided upon its own facts, with precedents being "at best, of doubtful value." United States v Berry, supra, page 613; United States v Wilcher, 4 USCMA 215, 217, 15 CMR 215.

Earlier, we noted that the law officer ruled the evidence admissible. On the post-trial review, however, the staff judge advocate disagreed with the ruling. He concluded that consent was not proved; but evaluating the effect of the evidence of the results of the searches, he determined there was no fair risk of prejudice to the accused. The Government contends that since the convening authority's action does not indicate he approved his staff judge advocate's conclusion, he may have actually disagreed with him, and concurred in the ruling of the law officer. In the absence of a separate statement

by the convening authority, we must assume he agreed with and acted upon the basis of the opinion and recommendations set out in the post-trial review by the staff judge advocate. United States v Grice, 8 USCMA 166, 23 CMR 390. That raises the question of the rationale of the staff judge advocate's approach to the issue. Did he recommend new findings of fact, or did he conclude that, as a matter of law, the evidence did not support the law officer's ruling? The difference is important. This Court has no power to make new findings of fact; and we cannot choose arbitrarily between the facts underlying the law officer's ruling and those supporting the convening authority's action. Our inquiry is limited to whether there is evidence in the record of trial sufficient to support the findings made by the convening authority. We defined our responsibility in this area in United States v Alaniz, supra, as follows: "this Court is not possessed of fact-finding powers . . . and . . . we . . . may not overturn a truly factual determination based upon the evidence of record made by intermediate appellate bodies possessed of fact-finding jurisdiction." If there is insufficient evidence in the record of trial to support new findings of fact made by an intermediate appellate authority, but sufficient evidence to support the findings at the trial, we can overrule the former and reaffirm the latter. United States v Wille, 9 USCMA 623, 26 CMR 403. Similarly, if the ruling of the intermediate appellate authority is one merely of law, and the ruling is erroneous, we can return the record of trial for reconsideration of the issue on a factual basis. United States v Wilcher, supra. The Government contends the staff judge advocate was wrong as a matter of law. Whether this be so need not detain us. If his conclusion that the evidence of the result of the searches did not prejudice the accused is correct, the legality or the illegality of the searches is of no importance.

---

the first search, "all items" of evidence were procured during the third search. However, no effort was made by the parties to differentiate between the

three searches. For the purposes of this appeal, therefore, we consider the issue as though authority for all three searches depends upon consent.

Improper admission of evidence obtained as a result of an illegal search does not justify reversal of an otherwise proper conviction, if the evidence does not prejudice the accused. United States v Higgins, 6 USCMA 308, 20 CMR 24; Woods v United States, 240 F2d 37 (CA DC Cir) (1956), reh in banc denied; cf. United States v Woodruff, 11 USCMA 268, 29 CMR 84. Appellate defense counsel maintain that the "mere presentation" of the bloodstained bed things "emotionally" prejudiced the court-martial and impeached the accused's denial of rape. By implication, the argument acknowledges the absence of prejudice as to the charge of assault with a means likely to produce grievous bodily harm. What is merely implied in the argument appears explicitly in the accused's trial testimony. He specifically admitted he struck the child with the metal baton. Other substantial evidence shows the "very serious" nature of the injuries inflicted upon the child; indeed, they were so serious as to require her to be hospitalized and placed on the list of "seriously ill" patients. Neither the baton nor the blood stains significantly affect the impact of the evidence establishing the commission of the assault charge. We hold, therefore, that as to this offense the staff judge advocate's recommendation was clearly correct. United States v Gaskin, 12 USCMA 419, 31 CMR 5.

As to the rape charge, uncontroverted testimony by several doctors who examined the child, including a specialist in gynecology, established there was a tear in her vagina, which indicated that "penetration" had occurred. One doctor testified the tear was "uncommon" unless caused by the sexual act or as the result of giving birth. The gynecologist testified the injury was "compatible" with sexual penetration, and it was "extremely remote" that it could be caused by "some [other] sort of semi-yielding type of material." On the initial examination dried blood was found inside the vagina, and the child's panties were covered with blood. The gynecologist also testified, without the slightest impeachment, that the tear extended into the upper vaginal tract, and the hymen was ruptured. Other testimony established that "wet smears" of the vaginal area were taken at about 11:30 to 12:00 o'clock on the morning of January 23, 1960; these smears, according to prosecution witnesses, showed the presence of male spermatozoa. Finally, evidence and admissions by the accused in his sworn testimony established beyond dispute that about 6:00 o'clock in the evening of January 19, the child left a neighbor's apartment; she was in "good health" and in a "perfectly active" state; thereafter, she was with the accused in their apartment; the next morning she appeared at her kindergarten class at about 9:00 a.m. in a "semi-coma"; during this period, the accused's wife was absent in the hospital and he took care of the household. Against this evidence and other incriminating circumstances,[2] which we have omitted in order to present the issue in the strongest possible light for the accused, is the accused's sworn denial that he physically molested the child and his further avowal that he loved her and in his "mind and heart" knew he would not "do a thing like that." There is evidence the child loved her stepfather and that he enjoyed a reputation for kindness, peaceableness, and outstanding performance of duty as a noncommissioned officer. Also to be considered is the testimony of Dr. Lothar Lautenbach, a qualified physician and a member of the faculty of the Department of Forensic Medicine, University of Erlangen. Testifying for the accused, he said it was "most likely not possible" that a smear taken seventy-four and one-half hours to eighty-nine and one-half hours after alleged intercourse would disclose the presence of male sperm. He admitted he knew of reports of cases involving young girls in which it was said that sperm was discovered seventeen days after coitus, but he thought "it is impossible." Dr. Lautenbach's opinion was predicated, in part, upon certain reference materials, among which was a text book on foren-

---

[2] These include pretrial statements by the accused to which we will refer later in this opinion.

sic medicine by Professor Albert Ponsold of Germany. Professor Ponsold, a qualified physician and professor of forensic medicine in the University of Muenster, testified in rebuttal as a prosecution witness. He said that from a time after birth to puberty the vaginal area is alkaline in nature; thereafter it turns acid. As a result, the male sperm tends to live longer in a child than in a mature woman. He specifically disagreed with a chart prepared by Dr. Lautenbach which reflected the number of hours of longevity of the sperm on the ground it pertained to an "adult woman"; in his opinion, male sperm could live in a child for 100 hours. Dr. Like, a pathologist, also testified that before puberty the male sperm is distinguishable in the vagina for a greater period of time than it is in the case of an adult female. Finally, Dr. Like testified that in his examination of the smear taken from the child, he found present the organism known as Staphylococcus aureus. Professor Ponsold testified that the presence of this organism "is a sign" of the non-acidity of the vagina.

Where does the evidence obtained by the searches fit into this picture? After weighing all the evidence, ▮▮▮▮▮ can it be said with "fair assurance" that the baton, the bloody bed things, and the location of blood spots in the apartment influenced the court-martial in its determination that the accused forcibly penetrated the child? Kotteakos v United States, 328 US 750, 90 L ed 1557, 66 S Ct 1239 (1946). The fact of penetration was spelled out so clearly in the medical testimony of the tear in the interior of the vagina and the ruptured hymen that there is no room to suppose the court-martial drew support for its finding on that issue from a possible collateral inference based on the blood stains and discovery of the metal baton in the apartment. That leaves for consideration the cause of the penetration. Appellate defense counsel strenuously argue that the challenged evidence tended to lessen "the force" of accused's denials of guilt. Here again, however, the effect of the evidence is insignificant alongside of, or in conjunction

with, the direct and positive medical testimony of the nature of the internal injuries and means by which they were inflicted. With more than "fair assurance," therefore, we conclude the search evidence did not influence the court-martial in its deliberations on the accused's guilt or innocence. United States v Woodruff, supra.

One final matter concerning the search issue remains. Appellate defense counsel suggest that because the law officer ruled the search was legal, the accused was deprived of the opportunity to litigate the question whether the second of several pretrial statements made by the accused was the product of the search. See United States v Harman, 12 USCMA 180, 30 CMR 180; United States v DeLeo, 5 USCMA 148, 162, 17 CMR 148. Underlying the suggestion is an assumption that the law officer erred in his ruling admitting the evidence. There is substantial evidence to indicate the assumption is unfounded, but for present purposes we accept the defense assumption that the law officer was wrong. The staff judge advocate expressly considered the point, and concluded that the statement was not the product of, or tainted by, the "evidence unearthed by the illegal search." Not only is there evidence to support that conclusion, but the record of trial compellingly shows nothing learned as a result of the searches tainted the second of the accused's statements.

There were three searches of the accused's apartment. One was made on January 20; the second was conducted on the 21st; and the third was carried out on January 22. On the first search only the baton was taken; all other items of evidence were obtained on January 22. The accused's second pretrial statement was made on January 21st. From the accused's testimony, it clearly appears that the only purported influence on his decision to make the statement of January 21st was an alleged representation to him by one of the investigating agents. The representation was made in response to accused's assertion that he was "worried" about the first statement he made;

36

it is to the effect that the accused need not worry about the first statement because the agents would " 'tear it up or file it away and it'll never be used.' " The accused's testimony on the point is as follows:

"Q What I mean is this, Sergeant: at the time you were interviewed on the 20th by Stephens and Burkman, what was your condition with respect to sobriety—by that I mean, were you plastered, drunk, hung-over, sober—what were you?

"A Well I had been drinking and my condition was not too good, sir.

. . . . .

"Q Were you intoxicated at the time you were interviewed?

"A Well I wouldn't say that I was intoxicated, sir, but I had been drinking, yes sir.

. . . . .

"Q Now did anything happen in Stuttgart, was there any conversation about this statement that you had made on the 20th?

"A Yes sir.

"Q Would you please tell us what was said, what occurred?

"A Well, I made the first statement, sir, I had made the first statement, sir, and I was going to make another statement or I said I would make another statement, but I was worried about the first statement, and Mr. Burkman told me, he said, 'don't worry about the first statement, we'll either tear it up or file it away and it'll never be used.'

. . . . .

"Q Now why were you worried about the first statement?

"A Well I didn't want the two statements to correspond—I mean I wanted to tell the truth, I didn't want the other statement, I didn't want to have two—and that's why I thought if I made the second one out they'd agree to disregard the first statement.

"Q Was there anything why you were bothered about the first statement, because you'd been drinking when you made it?

"A Yes sir, that was the reason.

"Q Was that one of the conditions that you imposed, that before you would make the second one that you wanted it understood that the first one would not be used?

"A Yes sir.

"Q And that it would be destroyed?

"A Yes sir.

"Q And that's what you told 'em?

"A Yes sir.

. . . . .

"Q Do I understand then that you would not make a second statement until they had kept a promise that they would tear up or dispose of or wouldn't use the first one?

"A That is correct, sir."

Accused's testimony shows that none of the fruits of the search were used to influence, coerce, or extract the January 21st statement. Rather, it compellingly appears that the accused made the statement for his own purposes. There is, therefore, no merit in the present suggestion that the accused was prejudiced by being deprived of an opportunity to show the statement was the product of an illegal search. United States v DeLeo, supra.

In his second claim of error the accused attacks the correctness of the law officer's ruling denying a motion for a mistrial. The motion was based on the law officer's reversal of a previous ruling admitting an oral pretrial statement by the accused. On the afternoon of January 20, the accused was interrogated by criminal investigation agents. After being fully advised of his rights under Article 31, and of the nature of the offense of which he was suspected, the accused made a written statement. This statement was admitted into evidence. In it, the accused said that in the early evening of January 19, the child told him she had fallen down the stairs leading to the apartment. However, she seemed not to be seriously hurt. Later in the evening, he got angry at the child and "whipped" her twice before he sent her to bed; he may have hit her "harder that [sic] . . . [he] should have"; he thought he "must have hit her with a baton" across the back and shoulders

when he got "real mad and . . . [he] did not realize what . . . [he] was doing." He denied he sexually molested the youngster. The child left the apartment before the accused awakened, and he did not know where she was until he received a telephone call from the school principal. The day after he made this statement, the accused went to take a polygraph test. As we pointed out previously, he testified at the trial he was "worried" about the first statement, and "thought if . . . [he] made the second one . . . [the agents would] agree to disregard the first statement."[3] According to the polygraph examiner in a pretest interview after again being advised of his rights under Article 31, the accused said his statement of January 20 was not true. He admitted he "probably inflicted all the injuries" the child had; he said he had been drinking "quite heavily," and did not remember what happened. The polygraph examiner further testified the accused told him he "was sure that he didn't use the baton or . . . [his sexual organ] in any way at all . . . [but] if anything was put in then it must have been his finger because he did remember one time having blood on his hand"; however, the accused thought the blood might have come from a wound on the child's head. At that point the accused said he would like to have legal advice. The interview was immediately terminated, and the polygraph examination was not held. The next morning, January 22, the accused was escorted to the staff judge advocate's office; there he conferred with Major McEwan, the assistant judge advocate.

The accused testified that when he "first come in," Major McEwan told him that as he was not charged with an offense he was not yet entitled to have military counsel appointed to represent him. Although he maintained he "didn't know what to do . . . or what to say" after receiving that information, the accused admitted he proceeded to state the purpose of his visit. He said to the Major: " 'Sir,

. . . I'm thinking about going up and taking the lie-detector test and I would like for you to explain to me or tell me something about the operation of the lie-detector as much as you possibly can.' " Major McEwan replied, " 'okay, I'll help you as much as I can.' " Major McEwan advised the accused that he did not think any court in the United States would admit the results of the test in evidence. The accused further testified that Major McEwan informed him of his rights under Article 31; and that he did not ask the Major's advice on, or discuss with him, any problem other than that of the lie detector test. After the interview with Major McEwan, and "as a result" of it, the accused decided to retain a civilian lawyer "to help . . . [him] in this case." The exact date he decided to retain such counsel is not set out in his testimony. However, after he was placed in confinement on January 28, he instructed his wife to wire his mother for $500.00.

Between his interview with Major McEwan and the instructions to his wife, the accused had other meetings with the investigating agents and made other statements to them. On January 24 he was interviewed by two agents. Once more he was advised of his rights under Article 31; and he made a written statement. The accused testified that in this statement he merely "put . . . in writing" the statement he had made previously to the polygraph operator. On January 27, after being twice advised of his rights under Article 31, he made another oral statement. Before the contents of the latter statement were brought before the court-martial, the law officer admitted into evidence the oral statement of January 21st to the polygraph operator. Defense counsel had interposed an objection to its admission on the ground the accused was "refused" a request for legal advice. In overruling the objection, the law officer held that "in this case" (*i.e.*, the January 21 statement), the accused "was given . . . [the] right to confer with a legal counsel." In the course of the ruling, he said

---

[3] The agents disputed the accused's testimony, and denied they said they would not use his first written statement.

he would instruct the court-martial it should not consider any statement taken "subsequent to the time" accused requested and was refused "legal advice," but there was "yet no such statement" before the court. Nevertheless, without preliminary inquiry into the effect of the accused's January 21 request for legal counsel, the law officer later allowed an agent to testify to the January 27 oral statement. The agent quoted the accused as saying two or three times, "I might have done it, I could have done it, I don't remember." No questions about this statement were asked by the defense at that time, and the trial proceeded without incident until the prosecution offered into evidence the January 24 written statement. Defense counsel then objected to its admission on the ground it was taken from the accused after he had asked for counsel "and had been denied it." Thereupon, trial counsel temporarily withdrew his offer of the January 24 statement.

Major McEwan was called as a witness. He testified he met the accused on January 22. His account of what transpired is as follows:

"A The Sergeant had apparently indicated he wanted to talk with the Judge Advocate, and my conversation with the Sergeant was substantially this: I informed him that he was entitled to be advised of his rights by a Judge Advocate officer if he so desired, he did not fall within the legal assistance program, but I would be able to inform him of his rights. I read to him Article 31 of the Code quite carefully, I explained it to him, I told him substantially that it meant he didn't have to answer any questions if he didn't want to, he didn't have to answer any questions particularly which might tend to incriminate him. I explained in fairly simple terms what it meant by, to incriminate him, what those words mean.

"Q Was there any conversation relative to counsel for the accused that you recall?

"A I racked my memory on that this morning. I don't know exactly what took place, but I do know this, that I had spoken with a number of individuals under circumstances such as that where they came to the Judge Advocate for advice, and if I told him anything about counsel it would be that he was entitled to retain individual civilian counsel if he chose to, that he was not entitled as a matter of right to military counsel but there would be nothing to prevent his requesting military counsel and that request would be given whatever consideration that it appeared to warrant.

"Q Do you recall any conversation with him relative to a lie-detector test and his rights and privileges concerning such a test?

"A There was something about it, and again I've racked my mind to try to recall exactly what happened, but I'm quite sure that I informed him that in no case that I knew of in any court could the results of a lie-detector test be received into evidence.

. . . . .

"Q As I understand, you at that time told him he had no right to counsel since he had not been charged—or similar?

"A I told him that he had no entitlement to counsel, but if he requested military counsel the request would be given whatever consideration it appeared to warrant. I told him he could certainly request counsel, sir.

"Q Did he request counsel?
"A. Not that I know of.

"Q And you didn't offer him counsel beyond advising him, that is, in offering counsel you didn't offer him an individual counsel?
"A That's correct, sir.

"Q But you did offer him certain advice as to the rights that he might have?
"A Yes sir."

After hearing Major McEwan and counsel's argument on the objection, the law officer ruled that "perhaps the technical . . . provisions of the right to consult with the Judge Advo-

cate was [sic] fulfilled," but he thought the accused might have concluded he was "refused" counsel. On that basis, he sustained the defense objection to admission of the January 24 statement. Obtaining a favorable ruling on that point, defense counsel moved in an out-of-court hearing for a mistrial on the ground the January 27 statement was also inadmissible. This motion was denied. The law officer indicated he would instruct the court "to disregard any statement made by the accused which was made subsequent to the time he requested counsel." He did, in fact, instruct the court-martial as follows:

"LO: Gentlemen of the court, due to my ruling on the admission of this statement and the reasons therefor, the court will disregard any statement made by the accused subsequent to the date upon which he sought legal counsel which was the 22nd day of January. There was one statement made subsequent to that time, according to the evidence, made to Mr. Burkman, and only one such statement. The court will remember to disregard that statement.

"TC: In other words, for clarification, Prosecution Exhibit Number 8 which has been admitted is still, may be considered by the court.

"LO: Any statements made in the presence of Mr. Burkman and Mr. Rasmussen—

"TC: May also still be considered by the court. In order to avoid any possibility of conflicting recollection as to the oral statements, as to which is admissible and which is not, I request the reporter read the testimony of Mr. Rasmussen relative to the—and Burkman—relative to the statement made by the accused on the 21st—

"DC: I object.

"LO: Objection sustained, you might if you desire have the statement of Mr. Burkman as to the subsequent statement read so that the court will know exactly what they are to disregard—the very short testimony given by Mr. Burkman—

"TC: Does the defense object to that procedure?

"DC: Yes.

"LO: Do you object to that?

"Yes sir.

"LO: Okay, gentlemen, objection will be sustained. Go ahead."

In our opinion, the law officer erred in instructing the court-martial to disregard all pretrial statements of the accused made after his interview with Major McEwan.[4] However, we

---

[4] In United States v Gunnels, 8 USCMA 130, 133, 23 CMR 354, we set out the essentials of the right to consult with counsel in connection with a police investigation as follows:

"A criminal proceeding . . . must be distinguished from an investigation by a law enforcement agent. Only in the former instance does the right to assigned counsel exist. . . . The distinction . . . does not, however, mean that a person suspected of the commission of a crime can be precluded from consulting counsel. The belief entertained by the Staff Judge Advocate and the investigating officers in this case that such a prohibition exists is wholly wrong. One may not have a right to appointed counsel because no charge has been lodged against him, but he is not thereby precluded from obtaining necessary legal advice. . . . We, therefore, strongly condemn the practice, which appears to be common in the military, of telling a suspect that he cannot consult with counsel in connection with an interrogation by enforcement agents. A suspect has no right to the appointment of military counsel, but he most assuredly has a right to consult with a lawyer of his own choice or with the Staff Judge Advocate. Cf. Rule 5(b), Federal Rules of Criminal Procedure. We also condemn, therefore, the Staff Judge Advocate's order to his assistants to refrain from advising the accused if he sought their counsel." [See also United States v Rose, 8 USCMA 441, 24 CMR 251.]

may assume for present purposes that, right or wrong, the ruling and the instruction to disregard made it improper for the court-martial to consider the evidence in its deliberations on the accused's guilt or innocence. That raises the problem of assessing the probable impact of the excluded evidence upon the court-martial.

On the post-trial review, the staff judge advocate assumed the evidence was initially admitted in error, but concluded there was no fair risk of prejudice to the accused because of the direct and specific instruction to disregard. Appellate defense counsel contend that under the circumstances of the case the instruction was manifestly ineffectual. They maintain the admissions of January 27 constitute the only direct evidence of rape and so sharply contradict the sworn denials of the accused at the trial as to compel the conclusion that the court-martial could not disregard them.

The effect of an instruction to disregard evidence has been considered by this Court in a number of cases. Reviewing the problem in United States v Shepherd, 9 USCMA 90, 95, 25 CMR 352, we said:

"Instructions by the law officer to the court-martial to disregard inadmissible evidence and erroneous actions by counsel may, in some situations, effectively eliminate the possibility of prejudice to the accused. United States v Shaughnessey, 8 USCMA 416, 24 CMR 226; United States v Russell, supra. Under other circumstances, a cautionary instruction is insufficient to overcome the adverse impact of the evidence upon the court members. See United States v Patrick, 8 USCMA 212, 24 CMR 22; United States v Warren, supra, page 429. There is no hard and fast rule in any particular case, but the general rule is that an accused must be accorded a fair trial."

We earlier noted the substantial testimony regarding penetration by sexual act. Placed alongside this evidence the pretrial statement is an unimportant crypticism. The essence of the statement is that the accused did not remember the assault; it is patently speculative as to the critical fact of the commission of the rape. So many assertions of not remembering appear in the accused's trial testimony that the pretrial statement to that effect is hardly likely to have impressed the court-martial. As to the force of the accused's denials that he sexually molested the child, these are practically indistinguishable from his pretrial equivocation. Thus, on cross-examination he testified as follows:

"Q Now, Sergeant, in answering my questions there are times when you are able to state positively that certain things occurred or did not occur; there are other times when you can state only, 'I do not remember'. Can you explain to the court what the distinction between those two types of answers is in your own mind?

"A Sir, would you repeat that, please?

Q I'd be glad to, Sergeant. You recall my asking you a number of questions—for example, that elicited or obtained from you an answer that you definitely did not touch the child's private parts, that you are positive of—correct—

"A Yes sir.

"Q You remember my asking you a number of other questions to which the only answer you have been able to give me is, 'I do not remember'—is that correct?

"A Yes sir.

According to the accused's testimony, he was accorded every right to which he was entitled. He was fully informed of his rights under Article 31; he was told he was not entitled to appointed military counsel but he could request individual military counsel and he could retain civilian counsel. The accused admitted that "as a result" of this advice he decided to retain civilian counsel. Moreover, the accused was advised on the specific question which led him to request legal advice; namely, the legal effect of the lie detector test which he voluntarily proposed to take.

"Q Now in your own mind, how do you distinguish between those two situations, in one where you are positive and the other where you cannot remember?

"A Well, sir, I don't know, I just don't recall—I can't say it.

"Q Is it that you don't remember, Sergeant, or is it that you don't want to remember?

"A I don't remember, sir."

We conclude that the motion for a mistrial was properly denied and that the law officer's instruction to the court-martial to disregard the evidence was sufficient to protect fully the accused's right to a fair trial. United States v Shamlian, 9 USCMA 28, 25 CMR 290; United States v Patrick, 8 USCMA 212, 24 CMR 22.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

I am unable to join in any way with my brothers in their view that a rehearing is not required in this case with respect to the charge of rape, in violation of Uniform Code of Military Justice, Article 120, 10 USC § 920. In my opinion, the need for reversal because of the introduction of the bloodstained bedding and failure to declare a mistrial after ruling accused's oral pretrial statement inadmissible is amply demonstrated by this record. I am not persuaded that we may properly avoid this result by weighing the evidence and resolving plain factual issues in favor of the United States. In short, I believe we should determine the existence of error here in accordance with well-established precedents, leaving the question of accused's guilt to another uninfluenced court-martial. Otherwise we fall into the fatal course of *ad hoc* disposition of appeals and the rule of men rather than law.

The accused stands convicted of aggravated assault, in violation of Code, supra, Article 128, 10 USC § 928, and rape, as noted above. Originally sentenced to dishonorable discharge, for-

feiture of all pay and allowances, reduction, and life imprisonment, the confinement portion of his sentence has now been reduced to twenty-five years. Our grant of his petition for review was restricted to the issues whether the law officer erred in refusing to grant a defense motion for a mistrial when he struck from the evidence an oral pretrial statement of the accused and whether the staff judge advocate erred in concluding that receipt of certain illegally obtained bloodstained bedding was not prejudicially erroneous. In order to put these questions in proper perspective, it is necessary to advert to the evidentiary picture disclosed in the record.

Accused's six-year-old stepdaughter, Debbie, was seen at a neighbor's apartment in good health at 6:00 p.m. on January 19, 1960. She left to return to her family's apartment. On January 19 and 20, her mother was in an Army hospital in Augsburg, Germany. Thus, Debbie, her stepfather, and a younger child were alone in the apartment.

On January 20, 1960, Debbie appeared at the local Army dependent school. The children called the teacher's attention to her condition. Her head and face were bloody, her right eye was closed, and she was in a state of shock. An ambulance was summoned, and the child was carried to a dispensary from which she was ultimately transferred to an Army general hospital. There, an examination disclosed extensive and severe bruises on her body, head, and extremities. She also suffered from a half-inch laceration of the scalp. The most significant injury, from the standpoint of the rape charge before us, was another laceration commencing at the posterior opening of the vaginal cleft and extending into the vagina itself.

A vaginal smear was obtained, and microscopic examination by a qualified pathologist led to a conclusion on his part that male sperm cells were present in Debbie's vaginal canal. This smear examination, however, was not conducted until January 23. Subsequent examination of another smear obtained

on January 25 revealed no spermatozoa.

Suspicion was directed toward the accused initially because of his reaction to information that his child had arrived at school in a severely injured condition and his express opposition to her hospitalization. He was apprehended by military police and turned over to criminal investigators. These officers testified that they obtained accused's permission to search his apartment. Agent Stephens described the manner in which accused "consented" to the search in the following language:

"Q What explanation did you make to him, if any, when you asked for permission to search his apartment?

"A I told him that relative to this investigation we would like to enter his apartment and that any evidence or pertaining to this investigation that was found in his apartment we would wish to take, at which time I told him, I had asked him for his key and he had given me some explanation that he didn't have a key, that he had left it for his wife with some neighbors or something and that he had only one key to the apartment. I acquired a key from the commissary officer in Leipheim who had possession of a key to his apartment.

"Q Well when you told Sergeant Justice that you intended to search his apartment and that you might keep anything you found there as evidence for charges by court-martial, *did he make any objection?*

"A *He did not.*

"Q *Did he consent to the search?*
"A *He did not object.*

. . . . .

"Q What in general was his response to your remarks concerning search?

"A *I asked him about the search and he said he had no objection to me entering his apartment and he so indicated by saying 'all right'.*" [Emphasis supplied.]

Agent Burkman testified concerning accused's granting of "consent" by stating:

"Q After this 31 warning, did Sergeant Justice discuss the matter in question with you?

"A We started in talking about it, in questioning him about the incident we talked briefly on it *and then Specialist Stephens approached him on the subject of searching his quarters, and Sergeant Justice offered no objections to it.* We told him, or Specialist Stephens did, that anything that would, that was found in the quarters, that had any connection with this investigation could be used as evidence against him, if we found anything, and he still gave permission to search the quarters.

"Q *I see. Well, was he asked whether he objected to the search?*
"A *Yes, he was asked if he objected to the search and he answered 'no', or words to that effect.*

"Q Did he make any utterances or say anything else in connection with questions relating to this search?

"A *No, he was in accordance with it, he didn't offer any serious objections in any way at all, in fact he didn't offer any type of objection to it.*

"Q And what did he say, if anything, when you told him that you intended to keep what you might find there for possible evidence in a trial by court-martial?

"A. *He made no reply to that, I mean that this was all brought out in an explanation to him that if we found anything it could be used as evidence against him, and that we requested permission to search his quarters, and asked him if he objected and he just answered either 'no' or 'go ahead', or something, words to that effect—I don't recall now the exact wording he used.*" [Emphasis supplied.]

Three searches were thereafter made of accused's apartment. The first resulted in the seizure of bloodstained bedding from accused's bed and that

**43**

of his stepdaughter. This was admitted in evidence over objection that the search was illegal.

During the period from January 20 through January 27, 1960, accused made four statements, two of which were reduced to writing. All were made after proper warning under Code, supra, Article 31, 10 USC § 831. In the first statement, executed on January 20, accused admitted whipping his child perhaps "harder that [sic] I should have" but stated that she had also fallen down the stairwell. He also declared that he had used an aluminum baton as the punitive instrument. He unequivocally denied sexually molesting Debbie in any way.

The second statement was made orally to Agents Rasmussen and Burkman on January 21. Accused testified that, during this interrogation, he told the agents he wished to secure legal advice but was informed by Agent Burkman that " 'you're not entitled to any legal counsel until you have been charged.' "

Burkman and Rasmussen stated accused's request for counsel did not occur until he had made an oral statement and that the interrogation was immediately broken off. This statement, accompanied by appropriate instructions, was received in evidence over defense objection. In it, accused admitted "that he probably inflicted all the injuries that Debbie had, or the child had, with the baton. He stated that if he had inserted anything into her vagina it was probably his finger; and he said he recalled having blood on his hands but he did not know where it came from, the wounds she had received, or from her vagina— and that was the extent of the admissions." Accused also stated that he was drunk and that, in part, "he did not remember inserting anything into her vagina."

Accused's third statement was executed on January 24 and consisted essentially of a written repetition of his second statement. It was excluded from evidence when tendered by the prosecution.

44

The fourth statement was oral and was made to Agent Burkman on January 27. It is the one with which we are directly concerned on this appeal and, in it, accused, in response to a question whether he had raped his stepdaughter, stated " 'well I might have done it, I could have done it, I don't remember'; he repeated that two or three times, that he might have done it, he could have done it, but he just couldn't remember."

As noted above, accused testified that he sought legal advice on January 21 but was told that he was not entitled to counsel until charges were preferred against him. The investigators admitted that accused indicated his desire for counsel but stated that, upon such request, they terminated their interview.

Agent Burkman testified that, on the morning following the interrogation on January 21, he escorted Sergeant Justice to the staff judge advocate section and turned him over to a Major McEwan, a judge advocate officer. McEwan, the section executive officer, conferred with the accused.

Accused testified that he informed Major McEwan that "I would like some legal counsel" and the Major replied that " 'you haven't been charged yet and you are not entitled to any legal counsel.' " McEwan informed him of his rights under Code, supra, Article 31, and, in response to a specific inquiry, told accused the results of a lie detector examination could not be used in any court in the land. McEwan "didn't say I didn't have to make any statement, he didn't explain, he didn't say I did not have to—I went up for legal advice and counsel which I did not get." Thereafter, in view of McEwan's statements, accused did not see any use in repeating his request for counsel or legal advice to the investigators. Nevertheless, "there was a lot of things I needed advice on, but after he told me that I was not entitled to the counsel, I didn't know what to do, I didn't know what to ask him or what to say—I mean I didn't know whether or not, or what he would say, after he told me that, sir." On the following

day, accused unsuccessfully sought to obtain funds with which to hire a civilian attorney. The topic of civilian counsel, however, was not discussed with Major McEwan.

After hearing the foregoing testimony, the law officer resolved the issue of denial of counsel against the accused and received in evidence his oral admission concerning the charge of rape.

After the admission was received and other witnesses had testified, the prosecution saw fit to call Major McEwan.

The Major declared that Sergeant Justice was escorted to his office on January 22. He described what transpired as follows:

"A The Sergeant had apparently indicated he wanted to talk with the Judge Advocate, and my conversation with the Sergeant was substantially this: *I informed him that he was entitled to be advised of his rights by a Judge Advocate officer if he so desired, he did not fall within the legal assistance program, but I would be able to inform him of his rights.* I read to him Article 31 of the Code quite carefully, I explained it to him, I told him substantially that it meant he didn't have to answer any questions if he didn't want to, he didn't have to answer any questions particularly which might tend to incriminate him. I explained in fairly simple terms what it meant by, to incriminate him, what those words mean.

"Q Was there any conversation relative to counsel for the accused that you recall?

"A *I racked my memory on that this morning. I don't know exactly what took place, but I do know this, that I had spoken with a number of individuals under circumstances such as that where they came to the Judge Advocate for advice, and if I told him anything about counsel it would be that he was entitled to retain individual civilian counsel if he chose to, that he was not entitled as a matter of right to military coun-* sel but there would be nothing to prevent his requesting military counsel and that request would be given whatever consideration that it appeared to warrant.

"Q Do you recall any conversation with him relative to a lie-detector test and his rights and privileges concerning such a test?

"A There was something about it, and again I've racked my mind to try to recall exactly what happened, but I'm quite sure that I informed him that in no case that I knew of in any court could the results of a lie-detector test be received into evidence." [Emphasis supplied.]

Major McEwan also testified that he had told the accused that there was nothing confidential about their interview and that he was "not his counsel." When questioned by the law officer, McEwan stated that he understood accused was seeking legal advice and that he told him *"he had no entitlement to counsel,* but if he requested military counsel the request would be given whatever consideration it appeared to warrant."* (Emphasis supplied.) To an inquiry concerning whether accused requested counsel, McEwan replied, "Not that I know of." He did not ask the Major "to assign a counsel to him."

On the basis of McEwan's testimony, the prosecution renewed its offer of the written statement taken from the accused on January 24. The statement was rejected upon defense objection, the law officer noting:

"LO: Lieutenant Belson, I will admit that perhaps the technical and purely technical provisions of the right to consult with the Judge Advocate was fulfilled. *But on the testimony of Major McEwan and the testimony of the accused himself, he was told that he did not have a right to assigned counsel, that he had a right to go out and hire civilian counsel, and if he made a request for military counsel, it might be assigned to him. I believe in the mind of the accused that he was refused counsel.* Now let's say he was refused adequate counsel at that time: for that reason I'm going to

**45**

sustain the objection put by the defense." [Emphasis supplied.]

Thereafter, in an out-of-court hearing, the defense counsel moved for a mistrial on the basis that accused's oral admission on January 27 concerning the rape was equally infected by the denial of counsel. The motion was denied, but the law officer agreed to instruct the court to disregard "any statement made by the accused which was made subsequent to the time he requested counsel." Upon reconvening in open session, he so advised the court members.

In its case, the defense adduced the testimony of a qualified criminal pathologist, who opined that it was "[m]ost likely not possible" to find spermatozoa in a child's vagina after elapse of the period of time between the alleged assault and obtaining of the smear here involved. He thought it possible that another organism, such as "Trichomonas Vaginalis" or deteriorated white blood cells, had been mistakenly identified as spermatozoa.

The accused elected to testify in his own behalf. His relation of the events effectively constitutes a judicial confession to the charged offense of aggravated assault. However, he again unequivocally denied sexual molestation of the child:

"Q Did you have intercourse with your stepdaughter, Debbie?
"A No sir, I did not, sir.

"Q *Did you have any forceful intercourse with her?*
"A *No sir.*

"Q *Did you have any intercourse with her at all?*
"A *No sir.*

"Q *Did you molest her sexually in any way?*
"A *No sir, I did not, sir."* [Emphasis supplied.]

On cross-examination, trial counsel sought to impeach accused with those of his pretrial statements admitted in evidence. Accused denied informing Agent Rasmussen that he "could have fondled the child" indecently. The following colloquy then transpired:

"Q. Now Sergeant, I'm not sure whether I understand your testimony: are you telling the court that you did not do any of these things charged against you, or are you merely telling the court that you do not remember doing any of these things charged against you?
"A *Sir, I know that I didn't rape her, I know that.*

"Q *Do you know that you didn't fondle her in any way?*
"A Yes sir." [Emphasis supplied.]

Thereafter, the trial counsel displayed the previously admitted bloodstained items of bedding to the accused and pointed out that they were found both on his bed and that of his stepdaughter. In response to questions put to him, accused stated that he had not noticed the stains when he arose.

Evidence was also adduced on behalf of the defense which tended to establish accused's good character, his fondness for his stepdaughter, and her return of that regard even after the incident. In addition, a doctor testified that he had examined accused's genitalia on January 21. He found "no evidence of bruising, bleeding, or any other evidence which would indicate traumatic coitus" or "a forceful intercourse."

In rebuttal, the prosecution introduced the testimony of another pathologist, who was of the view that spermatozoa would survive in a child's vagina for a period in excess of that involved in this case.

Turning initially to the search and the seizure of the bloodstained bedding, it is to be noted that the staff judge advocate found and the convening authority adopted the following position set out in the post-trial review:

"From the foregoing, it appears that the evidence as to whether or not the accused consented to the search of his apartment is not conflicting. Neither of the agents asserted that the accused 'consented'. Both testified that the accused did

'not object' and, at most, said 'go ahead' or 'all right,' 'or words to that effect.' In the Lantrip case, with facts closely parallel to the instant case, the court held this to be a peaceful submission to the law enforcement officers, an acquiescence rather than a consent thereto. *United States v Lantrip*, as quoted in *United States v Alaniz*, supra, page 316. ACM 13950, *Delton*, 24 CMR 734; distinguishable *United States v Hurt* (No. 10533), 9 USCMA 735 at 779, 27 CMR 3 at 47, in that the court there found 'substantial evidence of affirmative consent.'

. . . . .

*"In the final analysis, the evidence as to the circumstances under which the search here was made negatives a consent freely and voluntarily given.* There being no consent, there was no lawful search and it was error to admit the results of such search in the face of a timely objection by the defense counsel. . . .

"Error in the admission of evidence justifies setting aside a conviction only if the improper evidence is prejudicial to the accused. *United States v Bergen* (No. 6642), 6 USCMA 601, 607, 20 CMR 317, 323. Since there is sufficient competent evidence in this record, aliunde the improper evidence, to sustain the findings of guilty, the improper evidence is not considered prejudicial to the accused." [Emphasis partially supplied.]

In United States v Alaniz, 9 USCMA 533, 26 CMR 313, we were also confronted with the issue whether the accused had consented to a search of his property. Under circumstances almost identical to those here presented, a staff legal officer concluded there was no consent to the search, and the convening authority adopted that position. In returning the case for a determination by that officer concerning whether a subsequent confession was the product of the search, we said, at page 536:

"As we have stated in reviewing the record of trial, the staff legal officer concluded, as a matter of fact, that the law officer had erred in holding the search was with the accused's consent, and that the evidence obtained therefrom was admissible and so advised the convening authority. The convening authority clearly followed his staff legal officer's counsel and disapproved specification 1 of the Charge on the ground that the evidence of a search was inadmissible.

"In United States v Massey, 5 USCMA 514, 18 CMR 138, we stressed the convening authority's almost absolute appellate reviewing powers. *It is clear beyond cavil that this Court is not possessed of fact-finding powers, Article 67 (d), Uniform Code of Military Justice, 10 USC § 867, and that we may not overturn a truly factual determination based upon the evidence of record made by intermediate appellate bodies possessed of fact-finding jurisdiction. United States v Bunting, 6 USCMA 170, 19 CMR 296; United States v Moreno, 5 USCMA 500, 18 CMR 124; United States v Moreno, 6 USCMA 388, 20 CMR 104. In the present case the factual determination of this controverted factual issue by the convening authority is binding upon this Court."* [Emphasis supplied.]

Turning to the instant case, it is equally apparent that the staff judge advocate made a "truly factual" determination concerning whether the accused consented to the search of his apartment. He summarized the evidence and emphasized that there was no testimony that accused "consented." Rather, there were only statements that he made no objections to the proposed quest while in custody. Indeed, the staff judge advocate specifically noted that the evidence regarding this issue "was not conflicting" and ultimately concluded that accused did no more than acquiesce in the inevitable.

Every facet of the post-trial summary and discussion is amply supported by the record in this trial. It is to be particularly noted that each time

**47**

trial counsel sought an answer concerning the issue of consent—even when leading questions were used—his witnesses equivocated and satisfied themselves with a reply indicating mere lack of objection. Compare United States v Lantrip, 74 F Supp 946 (ED Ark) (1948), and United States v Wallace, 160 F Supp 859 (DC DC) (1958). Moreover, accused did not furnish the key to his apartment or the specific information by which entry was obtained. In short, the staff judge advocate had more than an adequate foundation for the inference of lack of consent which he drew from the evidence.

As there is support in the proof for his view, it is my opinion that our decision in United States v Alaniz, supra, requires that we accept this "truly factual" determination. Under the standard applied by the Chief Judge, therefore, the only question for decision is whether there is a fair risk that the evidence uncovered by the search prejudiced the accused's substantial rights.[1]

Consideration of this issue requires that we note accused repeatedly—in court and out of court—denied raping or otherwise sexually molesting his daughter. Moreover, he attacked the prosecution's presentation of circumstances tending to establish rape by adduction of contrary testimony from his own expert witness; evidence that his sexual organ bore no marks indicating forceful intercourse; and proof that he was a person of excellent character and kindly disposed toward his stepdaughter. Thus, a substantial question was presented to the court members concerning his guilt of rape. When the trial counsel produced previously admitted bloodstained bedding and used it on accused's cross-examination to diminish his credibility, it is patent that these items may be said fairly to have affected the determination of the fact finders. Indeed, few circumstances are more consistent with a sexual assault than a demonstration of the existence of bloodstained items from the accused's bed, in which it was shown that the victim did not sleep.

When these items were used by the Government in the manner depicted in this record, they were not mere quiescent paraphernalia harmlessly, albeit erroneously, before the court-martial. They were the prosecutor's traditional bloodstained exhibits, an active part of his ammunition, and, in my view, if such be the test, their demonstrative value to the United States clearly establishes a fair risk that the court-martial accorded them weight in its deliberations.

It is here that I believe the rationale of the principal opinion goes astray. Correctly concluding that the accused's own testimony leaves no room for harm to have resulted with reference to the charge of aggravated assault, it devotes several pages to weighing the prosecution's case against that of the defense. The testimony of the Government's experts is said to be so clear and positive that the bloodstained bedding could not have affected the rape verdict. The contrary defense case is simply dismissed, with no effect being given to the specific testimony that spermatozoa would most likely not have lived in the child's vagina sufficiently long to have obtained the critical smear. The results of the medical examination of accused's genitalia, and his repeated protestations that he did not molest Debbie sexually are also accorded no credibility. In short, the reasoning of the opinion is based upon a complete rejection of the defense case and a factual conclusion at this level that accused is guilty. But Congress has denied us the authority so to weigh evidence and to judge credibility. Code, supra, Article 67, 10 USC § 867; United States v Alaniz, supra; United States v Black, 12 USCMA 571, 31 CMR 157. And as we noted in the last cited case,

---

[1] The presence in this record of factors harmfully affecting the accused's substantial rights eliminates any need to determine whether, in the words of Mr. Justice Rutledge, reversal is perhaps required simply because of a "departure . . . from a constitutional norm or a specific command of Congress." Kotteakos v United States, 328 US 750, 764, 90 L ed 1557, 1566, 66 S Ct 1239 (1946).

at page 575, we simply cannot "resolve all factual issues in the case against the accused," for the court-martial, not this Court, are the judges of his guilt. Nevertheless, that is precisely what my brothers do in this case and, as I do not consider it proper so to assume the role of the military jurors, I necessarily must disagree with their finding of no prejudice to the substantial rights of the accused.

The existence of prejudice need not, however, be predicated on the use of the illegally obtained bloody bedding. The second issue before us deals with the law officer's ultimate exclusion of accused's oral statement that he "might have" raped Debbie and his refusal to grant a mistrial on the basis of its earlier receipt and consideration by the court-martial. When the weight of this inadmissible statement is added to the illegally obtained items, accused's chances of an impartial hearing of his case became nonexistent.

It is asserted that Sergeant Justice was not entitled to a mistrial after elimination of the oral statement for three reasons. First, it is stated the law officer erred in concluding that the statement was not admissible. Secondly, it is said the statement itself is "an unimportant crypticism" in light of the "substantial testimony regarding penetration by sexual act." Thirdly, it is declared the statement itself said no more than that accused could not remember the assault and, as his testimony was replete with inabilities to recall the critical events, the oral admission is not likely to have impressed the court members.

Taking up these reasons in reverse order, it seems to me the last ill construes accused's testimony regarding the rape charge. As set out above, he stated clearly and repeatedly that he had sufficient recall of the events to know positively that he neither raped his stepdaughter nor molested her sexually. He admitted there were events which he could remember and occurrences which he could not, but, again and again, he denied the commission of any sex offense. And consistent with this was the testimony of the defense expert, the evidence regarding the medical examination of the accused, and the proof of his good character. Thus, it hardly seems accurate to say his pretrial oral declaration that he "might have" or "could have" raped Debbie was so consistent with his trial testimony that there is no fair risk the former influenced the court-martial.

With regard to the proposition that the evidence of guilt is so overwhelming that accused's pretrial statement is "an unimportant crypticism," much of what has been said concerning the illegally seized evidence is also pertinent here. I can only repeat that this record presents a substantial factual issue concerning accused's guilt of rape. When the jury heard his pretrial admission that he "might have" or "could have" raped the child, I suggest accused's fate was so far sealed that the subsequent evidence adduced by the defense could receive but scant attention.

Of course, we cannot plumb the minds of court members anymore than those of civilian jurors, but, as noted in United States v Grant, 10 USCMA 585, 28 CMR 151, at page 590:

"'. . . Human nature does not change merely because it is found in the jury box. The human mind is not a slate, from which can be wiped out, at the will and instruction of another, ideas and thoughts written thereon.'"

In that case, we held it improper not to declare a mistrial when accused's commander vituperatively testified to his guilt and painted him as a despicable person unworthy of belief. Here, we have a court-martial allowed to hear testimony that accused admitted orally that he "might have" or "could have" raped his stepdaughter. In face of prosecution evidence tending to support that view, I suggest it takes little perspicacity to conclude that these members, honest as they might be, would be unable to abide by the law officer's instruction, erase the pretrial statement from their minds, and thereafter accord any real consideration to accused's sworn, and not unsupported, denials of guilt.

The last premise upon which the conclusion of lack of prejudice is founded is the simply asserted conclusion that the law officer initially erred in excluding the statement. An examination of this problem requires a more detailed analysis of our former opinions and the trial ruling.

In United States v Gunnels, 8 USCMA 130, 23 CMR 354, the accused was interviewed by investigators who advised him of his rights under Code, supra, Article 31, and informed him of the allegations of misconduct against him. Accused stated that he desired to make no statement until he had an opportunity to consult counsel. He was permitted to go to the office of the local staff judge advocate. There, he was told he could not get any advice and was shown a regulation which indicated he did not come within the purview of the legal assistance program. This was done at the direction of the staff judge advocate. Accused returned and made a statement to investigators which was subsequently received in evidence. We reversed, holding the statement inadmissible. Of the situation, we said, at page 133:

". . . Even in an administrative proceeding, Congress has directed that a 'person compelled to appear . . . before any agency or representative thereof shall be accorded the right to be accompanied . . . and advised by counsel.' 5 USC § 1005(a). *We, therefore, strongly condemn the practice, which appears to be common in the military, of telling a suspect that he cannot consult with counsel in connection with an interrogation by enforcement agents. A suspect has no right to the appointment of military counsel, but he most assuredly has a right to consult with a lawyer of his own choice or with the Staff Judge Advocate. Cf. Rule 5 (b), Federal Rules of Criminal Procedure. We also condemn, therefore, the Staff Judge Advocate's order to his assistants to refrain from advising the accused if he sought their counsel.*" [Emphasis supplied.]

We also declared, at page 134:

"We have no fear that the Staff Judge Advocate will be inundated by hordes of suspected accused seeking him out for advice as to their rights during the investigative proceedings by law enforcement officers; nor do we fear that by giving the accused advice as to his rights the Staff Judge Advocate will compromise his position as legal adviser to the convening authority, at least no more so than when he is asked to advise the investigating officer. United States v DeAngelis, supra. *It seems to us to be a relatively simple matter to advise an uninformed and unknowing accused that, while he has no right to appointed military counsel, he does have a right to obtain legal advice and a right to have his counsel present with him during an interrogation by a law enforcement agent.*" [Emphasis supplied.]

In United States v Rose, 8 USCMA 441, 24 CMR 251, we reiterated our holding in the *Gunnels* case. There, Naval intelligence agents, during an otherwise proper interrogation, informed an accused that he could not call his attorney and that, as no charges had been preferred, he had no right to consult counsel. We again held a subsequently obtained statement inadmissible in evidence and reversed.

In United States v Wheaton, 9 USCMA 257, 26 CMR 37, accused was told by a criminal investigator, in response to an inquiry whether he could have " 'any kind of counsel,' " that he was " 'not allowed to have counsel at that time.' " Accused admitted he was fully advised of his rights under Code, supra, Article 31, and that he had made a voluntary statement. We sustained a holding of the board of review that accused was misadvised of his right to counsel, stating, at page 259:

"It is arguable that the accused was simply informed that he had *no right to appointed counsel* as distinguished from *no right to consult counsel.* United States v Gunnels, supra. See also United States v Melville, 8 USCMA 597, 25 CMR 101. *However, the board of review construed the evidence as affirmatively indicating that the accused was mis-*

*informed as to his right to 'the benefit of counsel.' We cannot say as a matter of law that the board of review's finding has no support in the record of trial.* United States v Moreno, 6 USCMA 388, 20 CMR 104; cf. United States v Waymire, 9 USCMA 252, 26 CMR 32." [Emphasis partially supplied.]

Application of our holdings in the foregoing cases to the evidence before the law officer clearly supports his conclusion that the oral statement should be excluded. Major McEwan's own testimony was a masterpiece of hesitancy for he had "to rack his memory" to recall the nature of his consultation with the accused. In light of his declarations, there is small wonder the law officer concluded that the accused was misled concerning his rights and was thereby denied the opportunity to consult with an attorney. True, he said that McEwan may have "technically" complied with our holding in *Gunnels*— a most generous observation—but it is also true that, as he ultimately noted, there was a plenitude of proof to indicate a reliance upon niceties of language in order deliberately to mislead the accused and cause him not to consult a lawyer of his own choice.

The fact that Major McEwan advised accused of his rights under Article 31 is immaterial. In United States v Wheaton, supra, we reversed despite the accused's concession that he was so advised. The important consideration is not the existence of such advice but whether accused was made aware of his right to consult with counsel. United States v Gunnels, supra; cf. United States v Adkins, 11 USCMA 9, 28 CMR 233, and United States v Kantner, 11 USCMA 201, 29 CMR 17.

Finally, despite the taxing of his mental faculties, Major McEwan could not recall "exactly what took place" but if he "told . . . [accused] any-thing about counsel," he clearly eliminated any possibility of advice unless obtained from a civilian attorney. Indeed, McEwan's testimony is so unclear that the law officer would have been fully justified in expressly according it no credibility in face of accused's statements concerning the interview.

The real question, however, is not whether we agree with the law officer's ruling but whether there is in the record a basis for his belief that the accused was misadvised and that the subsequent statement was thereby tainted. United States v Wheaton, supra. As he heard and saw the witnesses and the evidence is clearly subject to the construction which he gave it, I am required to conclude that his opinion had a sound predicate. We cannot at this level, as a matter of law, hold that he was wrong.

In sum, I do not believe that this record demonstrates accused's guilt of rape so conclusively that a fair risk of prejudice is eliminated. When the Government introduced evidence obtained by an illegal search and seizure and an oral statement in which accused admitted that he "might have" or "could have" committed the offense, it thrust into the balance factors which cannot be overcome by a mere instruction to disregard or a weighing of the conflicting proof at this level. As Congress has wisely commanded that we reverse for any error which we find prejudicial to the rights of an accused and has limited our jurisdiction to legal issues, I cannot assume the authority to decide clear factual disputes. I believe my brothers do just that, and I accordingly register my disagreement.

I would reverse the decision of the board of review and return the record of trial for a rehearing on the rape charge or reassessment of the sentence on the basis of the findings of guilty of aggravated assault.