UNITED STATES, Appellee

v

ROBERT L. RUSHING, Private,
U. S. Marine Corps, Appellant

17 USCMA 298, 38 CMR 96

No. 20,194

December 1, 1967

*Fred W. Shields, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Frederick H. Campbell,* USMC, and *Captain W. H. Hogan, Jr.,* USNR.

*Commander Walter F. Brown,* USN, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel C. R. Larouche,* USMC.

QUINN, Chief Judge:

This appeal raises important questions relating to the Fourth Amendment right against unreasonable search.

The first question deals with consent to a warrantless search. It is well settled that a person may ▮▮▮ ■ voluntarily waive the protection of the Fourth Amendment and authorize a policeman to search his home or his personal effects without a warrant. United States v Wilcher, 4 USCMA 215, 15 CMR 215. Annotation: Validity of consent to search given by one in custody of officers, 9 ALR3d 858 (1966). In United States v Insani, 10 USCMA 519, 28 CMR 85, we held that a police officer requesting consent to a warrantless search need not preliminarily warn the individual he has a right to do and say nothing. Later, we indicated it was not an indispensable predicate to the admission of evidence of consent to a search that the individual be first advised he had a right to refuse his consent, but if he did consent anything found during the search could be used against him. United States v Whitacre, 12 USCMA 345, 347, 30 CMR 345. We applied these rules to consent obtained from an accused in police custody. United States v Justice, 13 USCMA 31, 32 CMR 31. See also United States v Hurt, 9 USCMA 735, 778, 779, 27 CMR 3. These opinions were based upon the current of decision in the Federal civilian courts. At trial, however, the accused's military counsel challenged the continued vitality of these principles in the light of Miranda v Arizona, 384 US 436, 470, 16 L ed 2d 694, 86 S Ct 1602 (1966). The law officer rejected the challenge, and ruled admissible testimony as to the discovery of marihuana during a search of the accused's personal effects in his squad bay.

Special Agent Philip J. Curley of the Office of Naval Intelligence at Camp Lejeune, North Carolina, received a report from an Air Force Office of Special Investigations on Okinawa implicating the accused in marihuana offenses committed on Okinawa in the period from November 1965 to January 1966. At Curley's request, the accused appeared at the Office of Naval Intelligence for questioning at about 9:00 a.m., April 19, 1966. Preliminarily, Curley informed the accused of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, but did not advise him of his right to representation by a lawyer.[1] After several intermissions for various reasons, including lunch and "time spent taking a [written] statement," in which the accused apparently related his use of marihuana on Okinawa and in California, the interview was terminated at about 2:55 p.m.[2] At that time, Agent Curley told the accused he "was desirous of searching" his effects. He advised the accused he "did not have the authority to make this search without" the accused's consent, and the accused "did not have to permit" the search, but if he was willing to do so, he should read and sign a form of waiver tendered him.

The document was titled "Waiver of Search." The accused read it. It recited that he had been informed of his "constitutional right not to have a search made" without a search warrant, and that he had the right to refuse to consent to the search, but that he did "hereby authorize" the search of his residence and personal effects and removal of "material or other property" desired by the agent. It also indicated that "[t]his written

---

[1] It should be noted that, at the time of the interrogation, preliminary advice as to the right to counsel was not yet considered a constitutional requirement. United States v Tempia, 16 USCMA 629, 37 CMR 249.

[2] A tape recording of the interview was made until the luncheon recess. This tape was examined by defense counsel before and during trial.

permission" was given "voluntarily and without promises or threats of any kind."

No advice was given the accused as to the right to counsel in connection with the search. Nor was he informed that anything found or taken by the agent could be used against him in a court-martial.

The accused indicated he understood the waiver, and said he was "willing" to let Curley search his effects. In his own handwriting, he filled in several blanks on the form, such as his name and service number and the name of the agent authorized to search, and signed it.[3] He and Curley proceeded to his company, where Curley talked to Captain Donald J. Hatch, the executive officer. The three of them then went to the accused's squad bay. The accused opened his wall locker and removed a drawer containing personal effects which he "partially" pushed under a bunk. Under some T-shirts and shorts, Curley found three "waxed-sandwich" bags containing a "green tobacco, weed like substance." He marked the bags and took them with him. Later examination by a chemist identified the contents as marihuana.

While the accused's interview with Curley occurred before *Miranda* was decided by the Supreme Court of the United States, his trial was held after the *Miranda* opinion was published. Consequently, he is entitled to the benefits of the constitutional doctrine enunciated in that case. United States v Tempia, 16 USCMA 629, 37 CMR 249. Cf. United States v Hardy, 17 USCMA 100, 37 CMR 364. Under the decisions of this Court, and other Federal courts, previous to *Miranda*, the form of advice given the accused by Agent Curley was appropriate and legally sufficient to obtain his consent to a warrantless search, even though he was subject to police restraint at the time. The question is whether the precepts of *Miranda* command a different interpretation of the Fourth Amendment. A few courts have already considered the question. Each saw no sound reason to adopt the *Miranda* procedures for the protection of rights secured by the Fifth and Sixth Amendments as indispensable safeguards for the Fourth Amendment right against unreasonable search. Gorman v United States, 380 F2d 158 (CA1st Cir) (1967); State v Forney, 181 Neb 757, 150 NW2d 915 (1967); State v McCarty, 199 Kan 116, 427 P2d 616 (1967). The importance of the issue impels me to put aside these persuasive precedents and examine the matter independently.

I start with the right to counsel in connection with a search. Does protection of the right of privacy under the Fourth Amendment necessarily include a right to the presence of counsel in the image of *Miranda's* determination that the right to counsel is an indispensable safeguard for the Fifth Amendment right against self-incrimination? Certainly the right to counsel is not confined to protection of Fifth Amendment rights. Rather, it exists in every "critical" confrontation between the individual and the Government, before trial as well as at trial. United States v Wade, 388 US 218, 226–227, 18 L ed 2d 1149, 87 S Ct 1926 (1967); Massiah v United States, 377 US 201, 12 L ed 2d 246, 84 S Ct 1199 (1964). To my knowledge, never before *Miranda* has it been suggested that the rights of the individual under the Fourth Amendment can be assured only by the presence of counsel during a search. The absence of any such suggestion in almost two centuries of critical analysis of the Fourth Amendment tends to support the conclusion that counsel during a search is not a constitutional requirement. Cf. Levy v Resor, 17 USCMA 135, 37 CMR 399. New in-

---

[3] The document was admitted in evidence at the trial. At the time, the law officer noted that the back contained handwritten notes, apparently by Agent Curley, as to circumstances of the search. To make certain these notes did not come to the attention of the court members, he had trial counsel read only the face of the exhibit; the record indicates the instrument was kept from the court members.

sights and research may, however, demonstrate the error of accepted principle or procedure. See Warden v Hayden, 387 US 294, 18 L ed 2d 782, 87 S Ct 1642 (1967); Camara v Municipal Court, 387 US 523, 18 L ed 2d 930, 87 S Ct 1727 (1967). I do not, therefore, consider the silence of the past as sufficient to vindicate the present.

Search of an individual's personal effects by Government agents is authorized by the Constitution. As the Supreme Court very recently observed, the home and place of business are not " 'sanctuaries' " into which the Government can never reach. Berger v New York, 388 US 41, 63, 18 L ed 2d 1040, 87 S Ct 1873 (1967). The Constitution protects people against "unreasonable" search. A reasonable search, therefore, is proper. At least four situations have been recognized as constitutionally valid bases for reasonable search: (1) A search authorized by a warrant issued by a proper official upon a satisfactory showing of probable cause; (2) a search incident to a valid arrest; (3) a search necessitated by exigent circumstances, such as "hot pursuit" of the criminal who has just perpetrated an offense; and (4) consent of the person having an interest in the property to be searched, and who may be adversely affected by the search.

No elaborate analysis is needed to demonstrate the dangers and impracticalities of extending the right to counsel to the first three situations. If advice as to the right to counsel is an absolute imperative for a search, as it is for custodial interrogation, then even a warrant-authorized search may be frustrated by the absence of any competent person on the premises or by the flight of such person on the officer's announcement of his presence and purpose. See 18 USC § 3109; Rule 41, Federal Rules of Criminal Procedure. As far as the search incident to arrest is concerned, it is patently absurd to require a police officer apprehending a criminal in the commission of an offense to refrain from searching him for a gun or other weapon, until he has first warned him of his right to the presence of counsel. The policeman's lot is not a happy one, but the Constitution does not command him to risk his life as a precondition to a search. Similarly, "hot pursuit" is not an occasion for cautionary instruction as to right to counsel. In fact, the absence of any discussion as to the right to counsel in a search, in the opinion in Warden v Hayden, supra, which was decided after *Miranda,* tends to indicate no Justice of the Supreme Court ever imagined that the Constitution confers a right to counsel in this type of search. What then of a search based on consent? Is it so dissimilar in nature as to demand different treatment? In *Insani,* supra, at page 521, we said we could "perceive no sound reason to set it apart from the other bases" for a legal search. I find nothing in a consent situation to make it so critical a stage of the proceedings against the accused as to require that the right to counsel be extended to it and to the ensuing search.[4]

A search is no more than a means of gathering evidence. There are no variable factors in the proceeding that can be monitored by counsel. Consent is not itself incriminatory. United

---

[4] In this area, too, there is a significant silence in the post-*Miranda* Supreme Court cases dealing with the constitutional principles of search. Camara v Municipal Court, 387 US 523, 539, 18 L ed 2d 930, 87 S Ct 1727 (1967), for example, commented on consent as a basis for a search. Discussing the problem of search to determine compliance with regulations for the health and safety of the community, the Court observed that "most citizens allow inspections of their property without a warrant. Thus, as a practical matter . . . , it seems likely that warrants should normally be sought only after entry is refused." There isn't the slightest intimation that consent is a nullity, unless the investigator first advises the individual that he has a right to a lawyer. See also See v City of Seattle, 387 US 541, 18 L ed 2d 943, 87 S Ct 1737 (1967).

States v Insani, supra. By itself, it cannot add to the weight of existing evidence in the hands of the Government. Cf. United States v Wade, supra, 388 US, at page 228. In short, consent as a basis for a search is a neutral circumstance as far as the accused is concerned. It is directed more to the propriety of proposed conduct by the Government than to a hostile confrontation between the accused and the Government. It merely obviates recourse by the Government to other alternatives of lawful action that may be open to it. The position of the individual asked for consent to a search may be compared to that of the person asked to give his fingerprints for identification or a sample of his blood for testing. In the latter instances, consent dispenses with the need to resort to other lawful means to realize the objective; but in neither case does the accused have a right to the presence of counsel to monitor the proceedings. See United States v Wade, supra. Consent to a search, like consent to the taking of a sample of blood or fingerprints, is not subject to manipulative conditions which endanger or derogate from the accused's right to a fair trial. At trial, the accused can still oppose the admission of any evidence discovered in the search in meaningful ways. For example, he may object to the evidence on the ground of relevancy, see United States v Aloyian, 16 USCMA 333, 342, 36 CMR 489; United States v Vierra, 14 USCMA 48, 52, 33 CMR 260; or he can dispute the Government's proof as to the nature of the evidence as contraband, or the fruit of the crime charged. See United States v Wade, supra, 388 US, at pages 227–228. All these circumstances support the view that the absence of counsel at the time of a request for consent to a search is not essential to preservation of the right of the individual, under the Fourth Amendment, to be secure from unreasonable search.

What of a request for a search addressed to an accused in police custody or subject to custodial interrogation? The question has a double aspect. The first is concerned with whether custody or interrogation is so potentially destructive of the right of privacy under the Fourth Amendment as to make essential a system of preliminary warnings as to that right and the right to counsel; the second phase is concerned with the direct applicability of *Miranda* to an in-custody request for consent to a search.

In Gorman v United States, supra, 380 F2d, at page 164, the Court of Appeals noted a "surface plausibility" for adopting a system of threshold warnings to a request for consent to a search similar to that prescribed in *Miranda* to safeguard the right against self-incrimination, but it found no cogent "reason in policy or precedent automatically to borrow a procedure adapted to one set of constitutional rights . . . and apply it to a quite different right, serving quite different purposes." Contra, Annotation: Validity of consent to search given by one in custody of officers, 9 ALR3d 858, 870–871. Certainly, the inherent pressures of a custodial situation are the same, whether the accused is asked to confess to a crime or consent to a search. I assume these pressures bear equally upon the voluntariness of a waiver of the Fourth Amendment right of privacy as they do upon a waiver of the Fifth Amendment right against self-incrimination.[5] This similarity does not demonstrate that counsel's presence at the request and at the search is indispensable to an accused's right to refuse his consent. A station house confession can make the procedural safeguards of trial empty formalities; thus, counsel's presence during the interrogation "enhances the integrity of the fact-findings processes in court." Miranda v Arizona, supra, 384 US, at page 466. Consent discloses nothing as to the accused's guilt

---

[5] Even before *Miranda* it was well settled that when the Government relies upon consent to a search received from a person in custody, its burden of demonstrating that the consent was voluntary is particularly heavy. See United States v Wilcher, 4 USCMA 215, 15 CMR 215; United States v Herberg, 15 USCMA 247, 35 CMR 219.

**303**

or innocence. As I said before, it merely provides a basis for further action by the Government. Neither the process of asking for consent, nor the search itself, is subject to variable factors that can condition these proceedings to incriminate the accused. Cf. United States v Wade, supra. In fact, the circumstances mentioned in the general discussion on the nature and effect of consent apply equally to consent obtained from a person in custody. All these materially differentiate a request for consent to a search from a request to answer incriminating questions. This Court commented upon the difference in United States v Insani, supra, at pages 520–521, as follows:

"Under Article 31, a person accused or suspected of an offense has, when interrogated, the right to be informed, first, of the nature of the alleged wrong; that he need not make any statement in regard to it; and, that if he does say anything, it may be used against him in a court-martial. If he is not so advised, a statement made by· him is inadmissible in evidence against him. United States v Nowling, 9 USCMA 100, 25 CMR 362. This right is entirely different from the right to be free from unreasonable search. It is reciting the obvious to say there can be an interrogation without a search, and, conversely, a search without interrogation. Where there is either interrogation or a search, the admissibility of evidence obtained therefrom is ordinarily tested by the principles applicable to the one or the other, as the case may be, but not to both. In fact, the accused at least impliedly concedes that evidence obtained as a result of a search authorized by competent authority is not inadmissible because the accused was not advised of his rights under Article 31 before the search. See United States v Davis, 4 USCMA 577, 16 CMR 151. However, he maintains that a different rule should apply to a search based upon consent. He argues that by giving consent to a search he provides a 'predicate for the admission' of any incriminating evidence which may be found as a result of the search and in effect his consent incriminates him.

"Consent to a search is by itself in no way incriminating. It relates only to the preliminary question of the lawfulness of the search. In that regard it is no different from any other basis for a legal search. We perceive no sound reason to set it apart from the other bases for a search by requiring that the accused be first warned of his separate and different rights under Article 31. Of course, the fact that the accused is informed of his rights under Article 31 may be considered in determining whether the accused consented to the search or merely yielded to the color of authority. See United States v Burdick, 214 F2d 768 (CA3d Cir) (1954). But the absence of such advice does not preclude a finding of free and voluntary consent as a matter of law. This is not to say that a consent search will never present an occasion for informing the accused of his rights under Article 31. In a number of cases we have pointed out an important distinction between the legality of a search and the admission of evidence of identification of the property by the accused as property belonging to him."

As I observed earlier, since *Miranda,* the Supreme Court of the United States has published a number of opinions analyzing the constitutional principles of search. In several, the Court referred to a search based upon consent, but in none did it intimate that preliminary warning is essential to preservation of the right to privacy. At the beginning of my opinion, I pointed out that several courts specifically declined to hold that a system of preliminary warnings comparable to that prescribed in *Miranda* for protection of the Fifth Amendment was necessary to safeguard the Fourth Amendment. No doubt substantial interplay exists between the Fourth and Fifth Amendments. The excerpt from our opinion in *Insani* describes one

way in which the two Amendments interact. But there also are significant dissimilarities between the process of interrogation and a request for consent to a search. Considering these differences, in the light of centuries of judicial experience with searches predicated upon consent, I am not persuaded that mandate of a system of threshold warnings in the image of *Miranda* is the only certain way to determine that consent was freely given, with full knowledge of the right to refuse.

Of course, preliminary advice as to the reason for the search, and to the effect that the search cannot be made without a warrant or other reason recognized in law, and that the accused has the absolute right to refuse to consent to the search, but if he consents any evidence found in the search can be used against him in a criminal trial, is eminently desirable. Of course, preliminary advice of this kind is strong evidence of an informed and voluntary consent, rather than submission to, or acquiescence in, the assertion of authority. Indeed, preliminary warning has been recognized as a sound and desirable practice; but it has not been propounded as a constitutional precept. United States v Justice, supra, at page 34; United States v Smith, 13 USCMA 553, 33 CMR 85; United States v Blalock, 255 F Supp 268 (ED Pa) (1966). *Miranda* does not command reversal of this view. I conclude, therefore, that it is not an indispensable ██ condition to the admission of evidence of consent to a search by a person, in or out of police custody, that before he gave consent, he was especially informed of the following matters: (1) The specific reason for the search; (2) that he has a right to counsel and to the presence of counsel before he gives his consent; (3) that the police officer cannot make a search without a warrant and without his consent; (4) that he has the absolute right to refuse to give consent to the search; and (5) that if he consents to the search, any evidence discovered in the search can be used against him in a criminal trial.

I turn now to the second aspect of a request for consent to a search addressed to a person in custody. This situation directly involves the system of preliminary warnings formulated in *Miranda*. To highlight the matter, let us suppose the accused was arrested in the lobby of a hotel, and asked to consent to a search of his hotel room. Let us suppose, further, that before he was asked for consent, the accused was informed by the arresting officer he had no warrant to authorize the search, that without the accused's consent he could not search the room without first obtaining a warrant from a magistrate upon demonstrating to him probable cause to make the search, and that if he gave consent, anything found could be used against him; and, finally, suppose the accused answered the request for consent as follows: "You don't need a warrant. Here is the key to my room; go ahead and search it."

Under *Miranda*, no statement obtained from "interrogation" in a custodial situation is admissible at trial, unless the accused was first informed of his right to remain silent and his right to counsel. Are the accused's remarks in the hypothetical situation "statements" resulting from "interrogation" within the meaning of *Miranda*? I think not.

In my opinion, the interrogation contemplated by *Miranda* is not the mere asking of a question irrespective of its content; it is rather questioning to elicit information about the individual's knowledge of the matters contained in the question. Consequently, not every question constitutes "interrogation" as defined in *Miranda*. For example, I am certain *Miranda* would not forbid use of remarks by an accused in the following circumstances: The accused is arrested on the street. On the way to the station house in a police car, one of the arresting officers asks him if he would like a cigarette. The accused answers, "yes," and accepts the cigarette. He lights it, takes a puff, exhales the smoke,

and says "well, I guess you'll find the money sooner or later, so I may as well tell you it's under the floorboards in the bedroom of my apartment." Indisputably, a question was asked the accused before he was advised of his right to remain silent and to have counsel present during interrogation. But the question as to whether he would like a cigarette does not constitute custodial interrogation, as I interpret that concept in *Miranda.* Here, the request for consent was made at the end of the interrogation. At the beginning, accused had been fully warned of his right to remain silent, but he had not been advised of his right to counsel. If he had been so warned, his consent would, under *Miranda,* be admissible against him. Yet, warning as to the right to remain silent and the right to counsel, both of which rights the accused might be willing to waive, would not necessarily apprise the accused that he has a right to refuse consent to a warrantless search. United States v Blalock, supra; cf. Gorman v United States, supra. Advice as to the Fifth Amendment right against self-incrimination is not conclusive of whether the accused voluntarily gave his consent to a search. United States v Insani, supra. As I have already observed, the two rights are conceptually different. In my opinion, a request for consent to a search is not "interrogation," and the accused's response is not a "statement," within the meaning of *Miranda.* I conclude, therefore, that *Insani* is still sound, and that evidence of consent to a search by a person in custody is admissible, without threshold warnings as to the right to remain silent and the right to counsel. In particular situations, the failure to give such warnings may weigh against the Government, but it does not automatically compel exclusion of evidence of consent. Cf. United States v Burns, 17 USCMA 39, 37 CMR 303.

Left for consideration is whether the accused did, in fact, consent to the search by Agent Curley. Three judicial authorities with the power to make findings of fact on the issue, the law officer, the convening authority, and the board of review, have found that the accused voluntarily consented to the search. In an earlier day, review in this Court would have focused on whether there was substantial evidence in the record to support the finding. United States v Wilcher, supra; United States v Sessions, 10 USCMA 383, 27 CMR 457; see also Rogers v United States, 369 F2d 944 (CA10th Cir) (1966), certiorari denied, 388 US 922, 18 L ed 2d 1371, 87 S Ct 2125 (1967). Appellate courts, however, have increasingly observed that when constitutional rights are involved "independent examination of factual issues" may be required. Berenyi v Immigration Service, 385 US 630, 636, 17 L ed 2d 656, 87 S Ct 666 (1967); see also Ker v California, 374 US 23, 32–34, 10 L ed 2d 726, 83 S Ct 1623 (1963). I approach the record of trial, therefore, with the broader view that the Government must establish consent by clear and convincing evidence. United States v Herberg, 15 USCMA 247, 35 CMR 219.

Submission to authority is not voluntary consent. The record contains evidence supportive of both consent and coercion. For example, the long period of interrogation suggests coercion; on the other hand, the accused's admittedly willing discussion of criminal conduct indicates he had no desire to hide anything, and, therefore, freely elected to allow the search. Similarly, the evidence demonstrates the accused knew the marihuana was among his effects; such knowledge tends to indicate he would not voluntarily consent to the search. United States v Wilcher, supra, at page 218; United States v Gregory, 204 F Supp 884 (SD NY) (1962). The inference, however, is opposed by other evidence indicating that the accused anticipated he could reach his locker before Curley started the search, conceal the marihuana, and thereby establish his innocence of any recent misconduct. See Grice v United States, 146 F2d 849 (CA4th Cir) (1945). I need not, however, evaluate the conflicting inferences. The accused's own testimony provides a direct and definitive

account of the circumstances that led to his consent to the search.

The accused testified that at the beginning of the interview he was advised of his rights under Article 31, Code, supra. He admitted he "fully" understood them, and elected to "reveal certain pieces of information" concerning "what had gone on before on Okinawa." During the recess for lunch, when Agent Curley left the ONI office to get sandwiches, he went to the waiting room in the ONI office to write out a statement.[6] Later, the statement was typed, and given to him. Apparently, at that point, he asked Agent Curley, what else he "planned to do." Curley produced the consent form.

On direct examination, the accused testified that when Curley gave him the form he said: " 'I would like you to sign this waiver of search to complete my interview.' "[7] Under cross-examination, he admitted he read the waiver, and understood he "had a right not to have CURLEY search." He signed the instrument, after filling in the blanks. It is certain, therefore, that the accused knew and understood he had a constitutional right to refuse his consent. It is equally certain he signed the waiver knowing what it was. The only question, therefore, is whether he did so of his own free will, or because he was coerced by Agent Curley or the circumstances of the interrogation. That question is answered by other parts of the accused's testimony.[8]

According to accused, he signed the consent form because he "thought maybe" Curley "could go through my outfit and maybe could search it without my consent." On cross-examination, he reaffirmed this explanation. His cross-examination testimony is as follows:

"Q [Trial Counsel]: In other words, you knew you had a right not to have CURLEY search your effects, isn't that a fact?

"A: Yes, sir, I felt that if I didn't sign it, it would be done on a command level."

It is not coercion or threat for a police officer to indicate to an accused in custody that if he refuses to consent to a search, the officer will apply for a warrant. Gatterdam v United States, 5 F2d 673 (CA6th Cir) (1925); Hamilton v State of North Carolina, 260 F Supp 632, 635 (ED NC) (1966); Cameron v State, 171 Tex Crim 224, 346 SW2d 845 (1961). A declaration of this kind is nothing more than the statement of an intention to follow a legal course of action. It is not at all comparable to a representation that the search can be made without a warrant or that a warrant can be procured when, actually, it is not reasonably certain that it can. See State v Trumbull, 23 Conn Sup 41, 176 A2d 887 (1961); United States v Baldocci, 42 F2d 567 (SD Cal) (1930). In any event, the idea that an application could be made to command for authority to search did not originate with Agent Curley. The accused thought of it himself; and he convinced himself that he should consent to the search. See Rinehart v State, 114 So 2d 487 (DC Fla) (1959), writ dismissed, 121 So 2d 654 (1960), certiorari denied, 365 US 849, 5 L ed 2d 813, 81 S Ct 812 (1961). His will to refuse consent was manifestly not overborne by any false representation of authority by Curley or any trick or pressure on his part.

A reading of the accused's testimony results in an abiding conviction that he gave his consent voluntarily, with full knowledge that he had the

---

[6] The statement was never offered in evidence.

[7] Curley's testimony is to the effect that he informed the accused he "did not have to permit this search," but if he was "willing to permit" it, he should read the waiver and be sure he "fully understood it."

[8] Curley also testified on the point. He stated he told the accused he "did not have the authority to make this search without his consent" and that the accused "did not have to authorize" the search. He further testified he made no promises to the accused and did not "employ any threats" against him.

right to refuse it and with a full opportunity to exercise that right. I, therefore, sustain the law officer's ruling admitting evidence of the results of the search.

The decision of the board of review is affirmed.

KILDAY, Judge (concurring in the result):

I join with Chief Judge Quinn in affirming the decision of the board of review. In achieving this accord, however, we are clearly motivated by divergent opinion. For this reason, I concur in the result only.

The harmless error rule has long been thought a doctrine repugnant to constitutional Fifth Amendment infirmities. Indeed, it has been described as an "impermissible doctrine." Lynumn v Illinois, 372 US 528, 537, 9 L ed 2d 922, 83 S Ct 917 (1963); Chapman v California, 386 US 18, 17 L ed 2d 705, 87 S Ct 824 (1967); cf. Bruno v United States, 308 US 287, 84 L ed 257, 60 S Ct 198 (1939); Payne v Arkansas, 356 US 560, 2 L ed 2d 975, 78 S Ct 844 (1958); Malinski v New York, 324 US 401, 89 L ed 1029, 65 S Ct 781 (1945); Spano v New York, 360 US 315, 3 L ed 2d 1265, 79 S Ct 1202 (1959); Jackson v Denno, 378 US 368, 12 L ed 2d 908, 84 S Ct 1774 (1964); see, also, Annotations, 1 L ed 2d 1735, 4 L ed 2d 1833, 12 L ed 2d 1340. Yet, even in this area, there appear signs of erosion. Chapman v California, supra.

On the other hand, as to constitutional Fourth Amendment abridgments, the harmless error doctrine has prevailed. In Fahy v Connecticut, 375 US 85, 87, 88, 11 L ed 2d 171, 84 S Ct 229 (1963), that defendant was convicted in a Connecticut State court of willfully injuring a public building, in violation of a Connecticut State statute. At trial, a can of black paint and a paint brush were admitted into evidence over objection. The Supreme Court subsequently reversed the conviction finding that the "erroneous admission of this unconstitutionally obtained evidence at this petitioner's trial was prejudicial; therefore, the

**308**

error was not harmless." In reaching this conclusion, the test utilized was "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Compare Chapman v California, supra.

This Court, too, has followed the practice of assessing for prejudice in search and seizure cases. United States v Justice, 13 USCMA 31, 32 CMR 31; United States v Smith, 13 USCMA 553, 33 CMR 85; United States v Battista, 14 USCMA 70, 33 CMR 282. In rejecting the more stringent rule of inherent prejudice in such cases, we noted in United States v Simpson, 15 USCMA 18, 22, 34 CMR 464:

". . . In view of our own decisions on the subject, we do not consider it wise to adopt so rigid a formula of reversal in advance of the Supreme Court of the United States." [See, also, United States v Vierra, 14 USCMA 48, 54, 33 CMR 260.]

These obvious differences indicate, in my estimation, a considerable divergence in view by the Supreme Court as to the treatment of errors arising from search and seizure and those arising from self-incrimination. Accordingly, there is no assurance that the Court would apply its holding in *Miranda* to what is basically a search and seizure question.

In United States v Tempia, 16 USCMA 629, 640, 641, 37 CMR 249, by means of a concurring opinion, I said of Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966),

". . . the Supreme Court construed and applied the *Fifth* and *Sixth* Amendments to the Constitution of the United States. It, in a not too common procedure, laid down what, in future cases, is to be regarded as providing minimum constitutional guarantees to one being interrogated as to the commission of a crime. Being of 'constitutional dimension,' Miranda v Arizona, supra, must be assessed accordingly." [Emphasis supplied.]

I agree that

"The decision of the Supreme Court on this constitutional question is imperatively binding upon us, a subordinate Federal court, and we have no power to revise, amend, or void any of the holdings of *Miranda,* even if we entertained views to the contrary or regarded the requirements thereof as onerous to the military authorities.

"We are, however, obliged to accord this decision full faith and credit. To do so, we must necessarily face constitutional issues forthrightly, realizing full well that '[w]hen a case has been decided by this Court, appellate review has terminated.' At the same time we cannot be unmindful that decisions of this Court may in turn restrict subsequent review by the Supreme Court. United States v Culp, 14 USCMA 199, 33 CMR 411."

Thus, as in the comparable past, I do not believe it now appropriate to apply the *Miranda* prerequisite to Fourth Amendment situations in advance of the Supreme Court. It may be that in the future the Supreme Court will so hold. In that event, so be it. However, the Supreme Court not having said that a *Miranda*-type warning is required to make consent to a search voluntary, I would not, in the absence of such a pronouncement, be the first to do so. State v McCarty, 199 Kan 116, 427 P2d 616 (1967).

Accordingly, I concur in the result reached by Chief Judge Quinn.

FERGUSON, Judge (dissenting):

I dissent.

There may be merit in the concept that, in the ordinary situation, a mere request that an accused person consent to a lawful search of his belongings does not require he be preliminarily advised of his rights as set forth in United States v Tempia, 16 USCMA 629, 37 CMR 249. But, in my view, when such consent is obtained as part and parcel of a criminal interrogation while the accused is in custody, it constitutes a statement, the introduction of which requires proof of the necessary warning as in the case of any other declaration made by the accused to interrogating officers. In this particular case, not only was the warning omitted, but the evidence also demonstrates the accused's will was overborne and that he merely acquiesced in the officer's demand to search his belongings. In my opinion, these matters constitute a violation of his rights which demand reversal of the conviction.

I

Special Agent Philip J. Curley testified that, acting on the basis of information received from an Air Force investigative agency that accused had been involved in marihuana activities on Okinawa, he caused the accused to report to his office for interview. Accused reported at 9:00 a.m. He was advised of his rights under Uniform Code of Military Justice, Article 31, 10 USC § 831, at that time and questioned concerning his activities in Okinawa and California before reporting to Camp Lejeune, North Carolina. He was not advised of his right to counsel. Among other things, Rushing was exhorted to tell the truth and that he would not be there for interview unless his command thought there was something to the allegations. He was constantly admonished not to withhold information and to cooperate with the authorities so that Curley might go to accused's command and inform it that Rushing was, in effect, a good Marine who was willing to stand up and take his medicine like a man. Curley conceded he had made these comments and also harped on the importance of accused's cooperation as to any decision which the command might make in the case. In addition, accused was not permitted to leave the interview room for the noon meal, and, when he mentioned a hospital appointment which he had, Curley stated he would have it cancelled. He emphasized it was important that this matter be settled before the interview was terminated.

Finally, shortly after 2:00 p.m., accused was asked to complete a form

**309**

which granted Curley the right to search his belongings on a consensual basis. According to Curley, before this was done, he carefully explained to the accused that he did not have to consent to the search and, if he did not, the process could not be carried out.

Accused's story in part follows that related by Agent Curley but differs in other material particulars. He emphasized the influence of Curley's declarations that his cooperation would ease his path with command and his inability to leave the investigator's office. Thus, he was not permitted to leave for lunch, and, on one occasion, when he actually attempted to depart the building, was ordered back into the interrogation room. Rushing admitted signing the form consenting to the search in the belief that, "just the way he made it sound all morning long," he would be kept at the office until he did so and that, in any event, Curley could obtain permission to search from the proper authorities.

After leaving the office with Curley and proceeding to his barracks, accused immediately attempted twice to reach his wall locker in advance of the agent but was turned back by a noncommissioned officer posted for the specific purpose of preventing such action. He even unsuccessfully resorted to use of the fire escape for this purpose. The subsequent search turned up the presence of marihuana, concealed among his clothing.

## II

Turning first to the question of the necessity of a preliminary warning in this case, I suggest that no extension of Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), is involved when a statement of consent is obtained from the accused during the course of a criminal interrogation and used to establish a predicate for the admissibility of incriminating evidence. First, I disagree with the principal opinion's attempt to segregate the Fourth Amendment's protections and insist that they must be considered separately from the shield

310

of the Fifth against self-incrimination and that of the Sixth guaranteeing the right to counsel. To the contrary, they are intertwined, and the existence of the protections in one is inescapably involved with that of the others. Thus, in the landmark decision of Boyd v United States, 116 US 616, 29 L ed 746, 6 S Ct 524 (1886), the Supreme Court long ago declared, at page 633:

". . . [The two amendments] throw great light on each other. For the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment."

Secondly, Miranda v Arizona, supra, does not deal solely with the rights of an accused under the Fifth Amendment to be protected against self-incrimination. While that salutary protection forms a portion of its rationale, it should be never forgotten that the Miranda decision is also an extension of the Court's prior views in Escobedo v Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964), dealing with the Sixth Amendment right to counsel. Miranda, supra, in order to effectuate a suspect's privilege under the Fifth Amendment, took the right to counsel involved in Escobedo and moved it back to the station house door, with the concomitant requirement that an effective warning as to that right be delivered at the outset of any period of custodial interrogation. Indeed, the Supreme Court itself noted in Miranda, supra, at page 440:

"We dealt with certain phases of this problem recently in Escobedo v Illinois, 378 US 478. . . .

"This case has been the subject

of judicial interpretation and spirited legal debate since it was decided two years ago. Both state and federal courts, in assessing its implications, have arrived at varying conclusions. A wealth of scholarly material has been written tracing its ramifications and underpinnings. Police and prosecutor have speculated on its range and desirability. We granted certiorari in these cases, 382 US 924, . . . in order further to explore some facets of the problems, thus exposed, of applying the privilege against self-incrimination to in-custody interrogation, and to give concrete constitutional guidelines for law enforcement agencies and courts to follow."

*Escobedo,* supra, therefore, delineates the right of an accused to counsel in connection with custodial interrogation by the police. *Miranda,* supra, extends that right and interprets it to mean that the accused must, at the threshold of any such interrogation, be advised not only of his Fifth Amendment right to remain silent, but also of his Sixth Amendment right to have counsel present during his questioning. Moreover, *Miranda,* supra, explicitly makes compliance with the warning requirements therein laid down the necessary predicate for the receipt of *any statement made by the accused during the course of his in-custody interrogation.*

To emphasize the reliance which the Supreme Court placed on enforcing an accused's Sixth Amendment right to counsel, reference need only be made to its more recent decisions in United States v Wade, 388 US 218, 18 L ed 2d 1149, 87 S Ct 1926 (1967), and Gilbert v California, 388 US 263, 18 L ed 2d 1178, 87 S Ct 1951 (1967). In those cases, the Supreme Court specifically found no violation of the accused's Fifth Amendment rights from being compelled to speak in a lineup. It said, at page 221, that "Neither the lineup itself nor anything shown by this record that Wade was required to do in the lineup violated his privilege against self-incrimination" which " 'protects an accused

only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature. . . .' Schmerber v California, 384 US 757, 761, 16 L ed 2d 908, 86 S Ct 1826, 1830."

Nevertheless, these cases were reversed on the basis that the accused had been denied counsel through the failure of the police to notify their attorneys and permit their attendance at the lineups. At the same time, the Court left no doubt as to the applicability to lineups of *Miranda,* supra, pointing out the need to guarantee to the accused "that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Wade,* supra, at page 226. What it there said of lineups applies with peculiar force to the situation now before us:

". . . But as is the case with secret interrogations, there is serious difficulty in depicting what transpires at lineups and other forms of identification confrontations. 'Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on. . . .' Miranda v Arizona, supra, 384 US at 448."

Taken together, then, these cases mark out for me the principle that, in all areas of critical pretrial confrontation, the accused must be advised of his right to have an attorney present or, if he is already provided with counsel, that an opportunity must be afforded that individual to be present. In *Wade,* supra, and related cases, that critical confrontation was an identification parade. In *Miranda* and *Escobedo,* both supra, it was an interrogation by police officers who held the accused in custody. In the case before us, it seems to me the same rationale must apply.

First, the accused was undoubtedly held in Agent Curley's custody, for he was forbidden to leave the office and, when he attempted to do so, was foiled, regardless of whether he sought

merely to leave and terminate the interview; or to obtain food; or to meet his hospital appointment. There is likewise no doubt that he was subjected to constant interrogation, though, on account of the failure to comply with *Miranda, supra,* his answers as such were not received into evidence. Nevertheless, during that period of interrogation, he was confronted with a written statement and his signature obtained as evidence that he was consenting to a search of his belongings. Could there be any more critical confrontation than that in a narcotics case? Here, the agent clearly sought evidence of accused's previously admitted participation in marihuana activities. He well knew that he could not obtain such through a search unless the accused consented thereto and he admitted his determination not to end the interview until he had closed the matter out. This is precisely the sort of "critical confrontation" with which the Supreme Court has been concerned in all these cases. It is the obtaining of communicative matter from an accused during a period of secret questioning which " 'results in a gap in our knowledge as to what in fact goes on. . . .' " *United States v Wade, supra,* at page 230. It was to protect the accused in this duel of wits with the police—so well exemplified here—that the court demanded he be warned of his right to have counsel present, as well as to eliminate the consequent argument at trial over whether the matters which the police obtained during that interview were freely given or extorted from one ignorant of his right to the constitutional protection of counsel. As in the case of pretrial lineups and confessions, consent obtained during a police interrogation gives rise to the same conflict and difficulty in reconstructing what occurred, with the officers on the one side suavely denoting full protection of the individual's rights, and the accused on the other telling his tale of pressure and coercion. Thus, I would conclude that, in the case of consent to search obtained during an in-custody interrogation, there is that sort of critical confronta-

tion between the police and the accused which demands the *Miranda* warning.

Moreover, there is no doubt that, in this case, a statement was obtained from the accused and used against him, without the necessary warning of his right to counsel. Thus, there was introduced into evidence, a document signed by the accused in which he admitted he had been fully advised of his rights in the premises and freely and voluntarily consented to the search of his belongings by Agent Curley. That this is evidence of a testimonial nature cannot be gainsaid, for there is no doubt on this record the law officer relied on the document in finding that consent was freely given for the search. Unlike Schmerber v California, 384 US 757, 16 L ed 2d 908, 86 S Ct 1826 (1966), and United States v Wade, supra, we deal here not with scientific evidence obtained from the accused or declarations made only for the purpose of voice identification, but with the written, communicative recordation of consent—a testimonial act designed to prove the accused agreed to the search and to permit the introduction of evidence seized during the subsequent examination of his effects. But *Miranda, supra,* states that *no statement* obtained from an accused during an in-custody interrogation may be received in evidence for any purpose in absence of the necessary warning, even though, indeed, it be entirely exculpatory in nature. If such be the law—and it clearly is—how then can we, by judicial fiat, except from the operation of that carefully constructed doctrine an evidentiary declaration by the accused obtained during such an interrogation without the proper warning? I conclude that we cannot and that, for this reason as well, the case must fall.

III

Finally, turning again to the facts of the case, it likewise seems to me the Government has in this instance failed to carry its heavy burden of proving the accused freely consented to the search here involved. As the Chief

Judge notes, on such constitutional questions, it is our right and duty independently to examine the facts on this level and make our own conclusion as to whether an accused's constitutional rights have been invaded. Ker v California, 374 US 23, 10 L ed 2d 726, 83 S Ct 1623 (1963). So viewed, I believe it clear that accused did not freely and voluntarily agree to an examination of his property. First, it is not controverted that Rushing was subjected to six hours of custodial interrogation prior to his consent being obtained. During that period, Agent Curley made it clear he was not to be released until the matter was finished. Not only was this evidenced by his refusal to allow him to leave to visit the mess hall, but another agent specifically prevented him from leaving when he sought to do so. Indeed, upon pleading a hospital appointment, accused was told it would be cancelled. Throughout the entire period, Curley referred constantly to the need for the accused to satisfy his superiors that he had cooperated with the authorities and that he had stood up like a man and a Marine when confronted with the accusations against him. Curley himself did not deny these matters, and admitted he had informed Rushing he would tell his commander of his cooperation. The measures which Curley used during the interrogation period were such that the board of review itself stated "we . . . would be naive in the extreme were we to conclude that the interview of this type and comments made throughout were not designed to 'induce' the accused to confess or to consent to the search" and to refer to the interrogation as conducted in "a police dominated atmosphere." Finally, if the consent was freely given, it is strange indeed that the accused, knowing of the presence of the contraband, immediately sought to reach his locker and prevent its discovery. Had he freely consented, it would appear that he would thereafter have continued to cooperate with Curley. To the contrary, however, it seems, while he acquiesced in the agent's strongly put demand for consent, the moment he obtained his freedom, he took measures, however unsuccessful, to prevent that consent from being fruitful. To me, the inference is almost inescapable that accused never freely gave his consent to have his locker and belongings examined.

We have many times pointed out that mere acquiescence in the desires of the police do not constitute consent that one's effects be searched. United States v Wilcher, 4 USCMA 215, 15 CMR 215; United States v Berry, 6 USCMA 609, 20 CMR 325; United States v Westmore, 14 USCMA 474, 34 CMR 254. Thus, in United States v Justice, 13 USCMA 31, 32 CMR 31, we said, at page 33:

"When consent to a search is asserted, it must be shown by 'clear and positive testimony.' United States v Berry, 6 USCMA 609, 20 CMR 325. The burden of proof is upon the Government. It is an especially heavy obligation if the accused was in custody at the time he purportedly gave his consent. Judd v United States, 190 F2d 649 (CA DC Cir) (1951); United States v Wallace, 160 F Supp 859 (DC) (1958), cited with approval in United States v Alaniz, supra. Mere submission to the color of authority of law enforcement officers, or acquiescence in the officers' announced or indicated purpose to search, is not consent."

Similarly, in United States v Page, 302 F2d 81 (CA 9th Cir) (1962), the court declared, at page 83:

". . . The government must prove that consent was given. It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given.' There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. ' "Courts indulge every reasonable presumption against waiver" of fundamental constitutional rights.' Coercion is implicit in situations where consent is obtained under color of the badge,

and the government must show that there was no coercion in fact. The government's burden is greater where consent is claimed to have been given while the defendant is under arrest."

And in Judd v United States, 190 F2d 649 (CA DC Cir) (1951), wherein the defendant allegedly consented to a search of his apartment after being held in custody for four hours, the court, in reversing, declared, at page 651:

"This burden on the Government is particularly heavy in cases where the individual is under arrest. Non-resistance to the orders or suggestions of the police is not infrequent in such a situation; true consent, free of fear or pressure, is not so readily to be found. . . . In fact, the circumstances of the defendant's plight may be such as to make any claim of actual consent 'not in accordance with human experience', and explainable only on the basis of 'physical or moral compulsion'. Ray v United States, 5 Cir, 84 F2d 654, 656."

The Government simply has not met this standard in the case before us. The accused was in custody for a number of hours. During that period, he was bombarded with demands that he cooperate and faced with thinly veiled threats as to what "command" would think if he did not. He knew that he would not leave the office until the matter had been concluded to the agent's satisfaction and there is small wonder that he finally acceded to Curley's bullying tactics and acquiesced in the demand to search his belongings. That "consent" is explicable only on the basis of the compulsion generated by the surrounding circumstances, Ray v United States, 84 F2d 654 (CA 5th Cir) (1936), and

I would so find. Accordingly, I would conclude there was no freely given consent in this case and reverse also on this basis.

In sum, then, I am of the view that my brothers err when they deem the doctrines of Miranda v Arizona and companion cases inapplicable to an in-custody interrogation resulting in obtaining "consent" to search rather than a confession or admission as such. In my view, such is a critical confrontation between the accused and the police. United States v Wade, supra. The accused should be entitled to be advised that he may have legal counsel during such questioning in order that he may know the legal consequences of the action the police desire him to take. In addition, a statement of consent obtained during a period of interrogation is clearly evidentiary in nature and, lacking a *Miranda* warning, can no more be used against the accused than any other statement. Finally, I am convinced by an independent examination of the evidence that there was no consent in fact given by this accused and that, on this basis, the evidence of the search should likewise have been excluded. As Judge Washington said, in Judd v United States, supra:

". . . Standards of this sort must be maintained and enforced by the trial and appellate courts. If they are not, the guarantees of the Bill of Rights can quickly disappear through tacit nullification."

In light of the failure to comply with Miranda v Arizona, supra, and the purported obtaining of the accused's consent to search in what the board itself admitted was "a police dominated atmosphere," I would reverse the decision of the board of review and remand the case for a rehearing.