UNITED STATES, Appellee

v

WILLIAM E. NOREEN, Specialist Four U. S. Army, Appellant

No. 28,073

August 9, 1974

*Captain Ward Mundy* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Lieutenant Colonel Edward S. Adamkewicz, Jr., Captain Gordon R. Denison,* and *Captain T. Barry Kingham.*

*Captain Robert B. Kurzweil* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen, Captain Joel M. Martel,* and *Captain Robert C. Roth, Jr.*

### OPINION OF THE COURT

QUINN, Judge:

Part of the evidence admitted against the accused at his trial for premeditated murder, and other offenses, was obtained in what he contends was an illegal search of his car.

Mrs. Murray was found dead on the floor of the living room of her home at Dugway Proving Ground, Utah, about 7:30 a.m., October 6, 1971. Her throat had been slit. Mrs. Murray's two chil-

dren had also been stabbed, but were alive. Investigation established that during the night the accused had been with Mrs. Murray at the NCO Club at Dugway. She rejected his offer to escort her home and left the club about 1:00 a.m., with a couple who lived near her. Shortly after she reached home, the accused appeared at the neighbor's house to ask where she lived. Before he left the club, the accused announced that he was going to do "something real vicious" to "screw up the post before he left." Told that he would probably get "into trouble," he replied that "they would have to catch him first."

Deputy sheriffs of the county obtained authorization to search accused's quarters at Dugway from the installation commander. Accompanied by Chief Warrant Officer Kirby, an Army criminal investigator, they first went to the accused's place of duty at the transportation section. On encountering the accused, Kirby identified himself as a CID agent; the deputy sheriffs were in uniform. The accused was informed he was a suspect in a homicide the officers were investigating. He was also advised of his right to remain silent and his right to counsel. In response to questions by one of the deputies, the accused indicated he understood "each" of his rights, and he expressed his willingness to "talk . . . now." He was then informed of the authorization to search his quarters and was asked to accompany the officers to his barracks for the search. He agreed. As they proceeded to the police vehicle, the accused was asked if he had a car; he replied in the affirmative and pointed to a station wagon. The group passed the vehicle on its way to the police car, and one of the officers noticed a laundry bag on the rear seat.

Nothing specifically incriminating was discovered in the search of the accused's area in the barracks. The deputy sheriff who conducted the search was apparently impressed by the limited amount of soiled laundry he found. He had been at the victim's home and the "vast" quantity of blood he saw there had con-vinced him that the clothing of the killer would have been splattered by blood. Consequently, he asked the accused whether he had other "dirty laundry." The accused denied that he had. Reminded about the laundry bag in his car, he maintained that it belonged to a friend who was away on leave. Without being first advised as to his right to refuse, he was asked whether he would allow a search of his car.[1]

Five persons testified to the circumstances of the request to search the car and the accused's response. Four witnesses were called by the Government, the two deputy sheriffs, Agent Kirby, and the accused's commanding officer, who had accompanied them to witness the search because "one of . . . [his] men was involved" and he wanted "to insure" that the search "was properly conducted." The fifth witness was the accused.

Before considering the particulars of the testimony, it is appropriate to dispose of appellate defense counsel's contention that the accused was in custody, and because he was in custody, the police officers were obliged to advise the accused he had the right to refuse consent, in the same way that a person in custody must first be advised of his right to remain silent before he is questioned. See Miranda v Arizona, 384 US 436 (1966). We considered that contention in United States v Rushing, 17 USCMA 298, 38 CMR 96 (1967), and concluded that, whether in or out of police custody, an accused whose consent to a search is sought need not first be informed he has the right to refuse his consent. Appellate defense counsel maintain, however, that the recent opinion of the United States Supreme Court in Schneckloth v Bustamonte, 412 US 218 (1973), "contains a crucial caveat," implying that such preliminary advice must be given, or evidence discovered in a search based upon the accused's alleged consent is not admissible at trial.

■ *Schneckloth* dealt with an accused who was not in custody; the Supreme Court held there was no constitutional

[1] The search of the car resulted in discovery of blood-stained shoes and articles of clothing. Over defense objection, these were admitted in evidence.

requirement for preliminary advice of the right to refuse consent as a condition to finding that a free and voluntary consent was given for the search. We perceive nothing in the Court's opinion to support the caveat discerned by appellate defense counsel. Federal Courts of Appeals that have considered *Schneckloth* and its implications have also discerned no such doctrine as to an accused in custody, and they have determined, as we did in *Rushing,* that the only predicate for the admission of evidence obtained as a result of a search based upon consent is whether the consent was freely and voluntarily given. United States v DeMarco, 488 F2d 828 (2d Cir 1973); United States v Ruiz-Estrella, 481 F2d 723 (2d Cir 1973); United States v Hearn, 496 F2d 236 (6th Cir 1974). United States v Rothman, 492 F2d 1260, 1264 (9th Cir 1973), reaffirmed in United States v Watson, — F2d — (9th Cir March 20, 1974). We adhere, therefore, to our decision in *Rushing,* and iterate that, while significant impairment of accused's freedom of movement by the police at the time he is asked to consent to a search bears upon the voluntariness of his action, such restraint or custody does not impose an obligation upon the enforcement officer to advise the accused first that he has a right to refuse consent, and if he chooses to give consent, evidence discovered in the course of the search can be used against him in court. The giving of such preliminary advice may be strong evidence that the individual's assent to the search was voluntary, but the absence of such advice does not preclude a finding, from other evidence, that the assent was voluntary.

Turning to the question of accused's consent, it is appropriate to note first the distinction recognized by the courts between consent and mere submission to the authority of the police officer, which does not constitute a waiver of the individual's right to be free from unreasonable search. United States v Ruiz-Estrella, supra; United States v Justice, 13 USCMA 31, 32 CMR 31 (1962). Whether the accused was in custody is disputed by the parties. He was not formally in arrest, but one of the deputies admitted that "in . . . [his] mind," the accused was "not free to leave," and if he had

tried he would have been stopped. The accused testified that he felt he could not refuse the deputy's invitation to accompany them to the barracks for the search of his area. Government counsel contend that these "subjective" beliefs are not determinative of the fact of custody, and the objective circumstances do not reflect any significant restraint on the accused's freedom of movement. See United States v Hall, 421 F2d 540 (2d Cir 1969), *cert den* 397 US 990 (1970). Appellate defense counsel maintain that the accused was under such restraint as to constitute an improper influence upon his freedom of choice in giving or withholding consent. They cite the special finding by the trial judge that the accused was not "as a practical matter, free to depart the presence of Deputy Pitt prior to the formal arrest." See United States v Ruiz-Estrella, supra at 728.

All the witnesses, including the accused, agree that other than the possible restraint on his freedom of movement, the accused was not subject to coercion of any kind, to threats, to improper influence, or to extensive questioning. The accused specifically admitted that he was not afraid of the officers. Certain differences appear in the testimony as to the language of the request made by the officers and the accused's response, but the substance of all the testimony by the officers was admitted by the accused. We give his version of the incident as the one most favorable to him, adding only that the accused's company commander testified that he understood the questions asked by the officers to mean they "were requesting . . . [the accused's] permission to search the vehicle" and that the accused could refuse such permission.

The accused testified that one of the deputies asked him if "I minded if they searched" his car. Initially, he maintained he did not remember his answer, but later, he contended he "more or less mumbled" a response which was "a negative remark," but he could not remember "what the remark was." Agent Kirby then asked whether his answer meant "we cannot search." He understood Kirby's question to be a request for permission "to allow them" to search. He knew he "had the option of saying

no," but he told them to "go ahead and search."

At different places in his testimony, the accused gave different reasons for his reply to Kirby. First, he testified that he "interpret[ed]" Kirby's words to be "a challenge for me to refuse"; he "accepted" the challenge and "let him search." Later in his testimony, he maintained that when Kirby asked his question, he thought about a sign at the gate to the installation which indicated that a car "was liable to be searched . . . while" it was on post, and he concluded that if he refused, "they'd go ahead and search," so there was no way he could stop them. In his findings of fact, the trial judge held that parts of accused's testimony, which were contrary to the testimony of other witnesses, were "fabrications," and these fabrications led him to find as false the accused's testimony "that he had granted consent because he thought a sign on post rendered his car subject to search at any time." Appellate defense counsel urge us to disregard the finding as irrelevant to the "real issue" of whether the evidence demonstrates that the accused's consent was freely and voluntarily given. Assuming the finding is immaterial to the issue, a matter we do not decide, the accused's conception of the gate notice and its effect was not the result of unlawful conduct by the police officers.

In *Rushing*, the accused maintained that he had consented to a search because he thought that, if he refused, the officer could obtain authority to search from the company commander. We held that accused's decision was the product of his own rationalization, uninfluenced by any declaration or threat by the officer. Here, too, the accused convinced himself that he should consent to the search. Similarly, the accused's "interpretation" of Agent Kirby's question as a challenge indicates that his decision to answer as he did was the product only of his own will. He responded to the challenge not because of coercion or improper influence by Kirby or the sheriff's deputies but because he wanted to. Considering all the evidence, we have no doubt of its sufficiency to support the trial judge's finding and the Court of Military Review's determination that the accused freely and voluntarily consented to the search of his car.

The decision of the Court of Military Review is affirmed.

Senior Judge FERGUSON concurs.