UNITED STATES, Appellee,

v.

Private (E–2) Raymond E. EDWARDS,
SSN 267–21–2072, United States
Army, Appellant.

SPCM 13210.

U. S. Army Court of Military Review.

27 Nov. 1978.

Colonel Robert B. Clarke, JAGC, Major Benjamin A. Sims, JAGC, Captain Larry D. Anderson, JAGC, and Captain Allan T. Downen, JAGC, were on the pleadings for appellant.

Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, Captain Stephen D. Smith, JAGC, and Captain Harry J. Gruchala, JAGC, were on the pleadings for appellee.

Before FULTON, TALIAFERRO and WATKINS, Appellate Military Judges.

## OPINION OF THE COURT

WATKINS, Judge:

The appellant, contrary to his pleas,[1] was convicted by a special court-martial authorized to adjudge a bad-conduct discharge of sleeping on post, larceny of a total of $76.00 in U.S. currency, and housebreaking in violation of Articles 113, 121 and 130 of the Uniform Code of Military Justice (U.C.M. J.), 10 U.S.C. §§ 913, 921, 930, respectively. He was sentenced by a court with members to the maximum authorized punishment, and the sentence was approved by the convening authority.

Appellant first argues that the military judge erred when he denied a defense motion to suppress evidence found during a search of his wall locker. The appellee, on the other hand, argues that the judge's ruling was correct and that the search was lawful under any one of three separate theories: (I) that the appellant voluntarily consented to a search of his possessions when his room in barracks was initially entered, with the aid of a passkey, by the Company CQ and two military policemen during the early morning hours of 17 August 1977; (II) that the search was properly authorized, based upon probable cause, by First Lieutenant Miller, who, in the capacity of Division Support Command (DISCOM) Staff Duty Officer, was physically present at the time appellant's wall locker was searched; and (III) that the appellant voluntarily consented to a search of his locker after Lieutenant Miller had authorized a search thereof.

## I

■ Regarding the first theory by which appellee seeks to justify the introduction into evidence of the incriminatory evidence ($76.00 in cash) found in appellant's wall locker, the facts are in dispute as to the extent of the search which was actually conducted by the MP's following appellant's apprehension and what is described as his "initial consent." However, all parties agree that, as a factual matter, appellant's locker was not searched at that time but rather some minutes or hours later, subsequent to the officer authorization which is discussed in Part II of this opinion, below. According to the record of trial, the principal reason that appellant's wall locker was not searched earlier is that it remained locked following his apprehension and he refused, or at least was unwilling, to unlock it. This evidence is more than sufficient to discredit appellee's "initial consent" theory of admissibility.

## II

■ Appellee next argues that the search was properly authorized, based upon probable cause, by Lieutenant Miller, the DISCOM Staff Duty Officer. There is no question that Lieutenant Miller was physically present and that he was instrumental in effecting entry, by the MP's, into appellant's locker. The issue, of course, is whether his search authorization was proper in light of the probable cause requirement of the Fourth Amendment. Lieutenant Miller's testimony on this point is revealing. He indicated at trial that he did not feel that he was the proper one to authorize the search and that, when he went upstairs to the appellant's room, "it was still [his] feeling that somebody from the company was going to come and make the authorization." The circumstances under which he changed his mind and authorized the search were as follows:

I told them that I was the duty officer of DISCOM and that I wanted to wait until the on-call duty officer arrived to authorize the search, since he was a member of the company. So we waited for about 20 minutes half hour and still the on-call officer didn't arrive. At that time the MP's had been in communication with the

1. The appellant originally entered a plea of "Guilty" to the alleged offense of sleeping on post. During the providency inquiry, however, he requested, and received, permission to change his plea to "Not Guilty."

desk sergeant over here at the MP's and had been instructed to bring the suspect to the MP station if no one would authorize a search and at that point is when I authorized it.

The trial testimony of Specialist McGaha, another Government witness and the senior military policeman on the scene, directly corroborates that of Lieutenant Miller regarding the search authorization. In response to questions framed by the trial counsel, McGaha testified as follows:

Q: You mentioned that you told Lieutenant Miller about the situation?

A: Yes, sir.

Q: Exactly what did you tell when you were talking to him?

A: I told him that Flores and Ferri had an amount of money ripped off, stolen, larceny and I told him that they did—that Flores did identify Edwards as he left the room and all we needed was his consent to search.

Q: Did you try to put any pressure on Lieutenant Miller to authorize the search?

A: No, sir, he said he couldn't consent. I said, 'Well, without your consent we can't search.'

Q: Did he indicate why he didn't want to?

A: He indicated that because it wasn't his unit that he was in 48th Med.

Q: So this is the only reason he told you he didn't want to authorize the search?

A: Yes, sir.

Q: What happened next?

A: Well, we started to take—we told Edwards we were going to take him down to 910, Building 910, 2 AD MPI. We started to walk out of the room and Lieutenant Miller stopped me and asked me what about if the evidence is in the room? I told him that there was nothing that I could do without consent, even if I did search the room it would be an illegal search.

Q: And by consent you meant authorization?

A: Yes, sir.

Q: Then what took place after that?

A: Lieutenant Miller said, 'Go ahead and search the room', and that he would give consent at that time.

Specialist McGaha's testimony is significant, not only in regard to the manner in which Lieutenant Miller authorized the search, but also as evidence of the factual information regarding the alleged offense which was available to Miller at the time. Concerning this latter matter, Lieutenant Miller's primary source of information was Sergeant Muffler, the Company CQ on the evening of 16–17 August 1977. Sergeant Muffler's testimony was that he had informed Miller of the alleged theft, that ". . . these two guys had some money taken," but that prior to the time Lieutenant Miller authorized the search he (Muffler) did not recall, and did not believe, that he had informed Lieutenant Miller of the identity of the suspect. Muffler further testified that he did not believe that the MP's (McGaha and Coleman) had disclosed this information to Lieutenant Miller either, because ". . . [t]hey were primarily interested in the permission to go on with their search."

Lieutenant Miller's testimony on this point was that before he arrived in the company area he had been told (apparently by Muffler), that ". . . a larceny had just occurred in one of the rooms and that two individuals could identify the individual who was suspected of stealing their money." Miller further stated that, subsequent to his arrival in the company area, he received ". . . no other information except that Edwards was identified as the man that had—by the CQ that that was the man that had been identified as a suspect." More specifically, Lieutenant Miller testified that he had neither met, nor spoken to, the victims, and that he had no idea what they were like.[2]

---

**2.** The record of trial discloses that the victims, Flores and Ferri, had departed the company area prior to Lieutenant Miller's arrival. Apparently they had gone to the MP station to

On redirect examination, Lieutenant Miller testified that, after arriving on the scene, there was one other possible basis for the belief that evidence might be found in the appellant's room. That was Miller's personal observation that ". . . Edwards was fully clothed and didn't look like he had been in bed at all." This latter conclusion had no foundation in fact. The record of trial clearly establishes that, prior to Miller's arrival, appellant had indeed been in bed, ostensibly asleep. He had been directed to get up out of bed and get dressed by the military policemen (McGaha and Coleman) who, in the company of the CQ (Sergeant Muffler), had entered his room with the aid of a passkey some time earlier.

Following the oral argument of the trial counsel that the search of appellant's wall locker could be justified as a properly authorized search, the trial judge perceptively noted the factual discrepancy mentioned above. Additionally, he seemed to invite the attention of the Government counsel to the tenuous nature of what is now described as Lieutenant Miller's probable cause determination by recalling Miller's own testimony on the subject:

MJ: The only thing Lieutenant Miller indicated was that there had been a larceny and after he arrived he was informed that the two victims and apparently according to Lieutenant Miller they were not identified by name but they could identify the person who had taken the money. With no indications of the victim's words when the larceny took place, how they could identify him, or who the person was who supposedly took the money.

On the basis of the foregoing information and all of the evidence of record, the conclusion of the reviewing staff judge advocate that Lieutenant Miller received insufficient information upon which to authorize a probable cause search is unquestionably correct.[3] In reality, Lieutenant Miller did little more than acquiesce, or, in the language of the senior military policeman present, "consent," to a search of appellant's locker, based merely upon suspicion.

III

■ The final theory by which the Government seeks to justify the search of appellant's wall locker is voluntary consent on his part, purportedly given subsequent to the time Lieutenant Miller granted authority for the search to proceed. The trial testimony of all of the witnesses is consistent with respect to the matter of the timing of appellant's consent. It was given immediately following Lieutenant Miller's authorization to search, while the appellant was still in the physical presence of the military policemen and under apprehension.

According to the sworn testimony of the appellant, the reason he initially refused to consent to a search of his locker by the MP's was that he objected to their methods and his company commander ". . . [was] supposed to be [there] during the search." Subsequently, following Lieutenant Miller's search authorization, the appellant consented ". . . since the proper people whoever they needed for authorization was there." In response to leading questions from his counsel, the appellant went on to indicate that his consent was conditioned upon the utilization of proper procedures, so as to safeguard his constitutional rights. On cross-examination, appellant again indicated that he did not want the search to be conducted until the proper officers were there, to make sure it was conducted properly. One such exchange between appellant and the trial counsel took the following form:

Q: Then after Lieutenant Miller came you consented to them looking in your wall locker, is that correct?

---

prepare written statements concerning their knowledge of the alleged larceny.

**3.** *See* paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition);

*Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

A: Yes, sir. The MP's asked Lieutenant Miller and they got Lieutenant Miller's, SDO, consent and the people at the station also need your consent to search. I said, 'Well, since the proper people, proper procedures to protect my rights and all this are here,' I said, 'I have no objection,' so I unlocked my locker.

On redirect examination, the appellant reiterated his concern, prior to the time he gave his consent, about proper authorization procedures and the protection of his constitutional rights.

During the rather extensive evidentiary hearing on the defense motion to suppress, the Government adduced no evidence at odds with appellant's version of the manner in which his consent was obtained. Only one prosecution witness touched on this particular subject, and the testimony of that witness, Private Coleman (one of the two apprehending MP's), tends to confirm that an intimate nexus existed between Lieutenant Miller's authorization to search and appellant's consent, and that, practically speaking, the former was considered much more consequential than the latter. Pertinently, Private Coleman testified on direct examination as follows:

A: We then as soon as the SDO got there we started the search. We went through everything—

Q: Before you started the search, did you—did Specialist McGaha, at that time, ask Edwards again if he consented?

A: Oh, yes, we definitely asked him twice. In front of the SDO, *we had to let him know that it was alright for us to search.* [Emphasis supplied.] [4]

Appellant's continual emphasis on proper authorization procedures was such as to evoke the following comment from the trial counsel during his final argument in opposition to the motion to suppress: "[t]he accused on the stand testified that he freely consented but that he was certainly concerned that the proper people were there to make sure his rights were protected." As summarized in a recent case, the law of consent is as follows:

A search of property may lawfully be made with the freely given consent of the owner. Manual for Courts-Martial, 1969 (Rev.), paragraph 152. However, '[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.' *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). See also *United States v. Mayton,* 23 U.S.C. M.A. 565, 50 C.M.R. 784, 1 M.J. 171 (1975); *United States v. Smith,* 13 U.S.C. M.A. 553, 33 C.M.R. 85 (1963). The burden of the government to prove free and voluntary consent is especially heavy if the accused is in custody when the consent was purportedly given. *United States v. Justice,* 13 U.S.C.M.A. 31, 32 C.M.R. 31 (1962); *United States v. Decker,* 16 U.S.C.M.A. 397, 37 C.M.R. 17 (1966).[5]

In the instant case, Lieutenant Miller was the only officer on the scene at the time the search was conducted. As discussed above, his search authorization was legally defective. It was this defective authorization, however, which directly precipitated appellant's acquiescence to the search of his wall locker. Indeed, the practical effect of Lieutenant Miller's search authorization was to suggest to appellant that further opposition to the search would be futile, if not improper. *Bumper v. North Carolina, supra,* ex-

---

4. In his argument to the trial judge on the suppression motion, trial defense counsel argued that, at the time of the search, the MP's were proceeding on a proper-authorization theory rather than on a consent theory. He noted that they, along with Lieutenant Miller, had exited appellant's room without conducting the search and that they returned to search appellant's wall locker only after Miller authorized the search.

5. *United States v. Fox,* 2 M.J. 377, 380 (A.F.C. M.R.1977), *aff'd* 4 M.J. 89 (C.M.A.1977).

pressly holds that a search cannot be justified on the basis of consent when that "consent" has been given only after the official conducting the search has asserted that he possesses a warrant.[6] The Court described such a situation as "instinct with coercion" and further indicated that "[w]here there is coercion there cannot be consent."[7] Accordingly, the final theory by which the Government seeks to justify the introduction into evidence of the currency seized during the search of appellant's wall locker is deemed to be without merit. The military judge erred to the substantial prejudice of appellant when he failed to grant the defense motion to suppress the proffered evidence as the fruit of an illegal search.

■ Testing the remaining evidence of record against the elements of proof of larceny, dismissal of Charge II and its specification is required because of the failure of proof of a wrongful taking with the requisite specific intent. A similar result is reached with respect to Charge III and its specification, housebreaking. The specific intent element is not established by the evidence. The evidence is sufficient, however, to establish each element of the lesser included offense of unlawful entry.

Appellant's remaining assignments of error are considered to be nonmeritorious.

The findings of guilty of Charge II and its specification is set aside and that charge is dismissed. In addition, only so much of the findings of guilty of Charge III and its specification as finds that the appellant did, on or about 17 August 1977, unlawfully enter Room # 325, the property of the United States Government, occupied by Specialist Four Albert G. Flores and Private First Class John E. Ferri, in violation of Article 134, U.C.M.J., is affirmed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted and the entire record, the Court affirms only so much of the sentence as provides for confinement at hard labor for six months, forfeiture of $265.00 pay per month for six months, and reduction to the grade of Private E–1.

Senior Judge FULTON concurs.

TALIAFERRO, Judge, dissenting:

Clearly, on two occasions, appellant consented to a search of his barracks room. The first consent was granted after the military police had gained entry into his room by means of a passkey. The two obviously inexperienced and seemingly ill-informed military policemen then delayed the search, or a portion of it, until they had sought and obtained the "consent" (or the authorization) of one Lieutenant Miller, all of which had no effect upon appellant's previously granted consent. Upon return of Lieutenant Miller and the military policeman who had gone to get him, appellant renewed his consent "since the proper people . . . [were] there." Appellant admits there were no handcuffs, threats, promises, or other coercive circumstances influencing his consent. He had been told he was "under apprehension" but there had been no act of taking him into custody. Viewing the two acts of consent in the light of the "totality of the circumstances" doctrine espoused in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), appellant's consent was voluntary on both occasions. Appellant opened his locker, without comment, when requested by Lieutenant Miller. It was not until the trial of this case that appellant announced he had not consented to the search of his locker. I find no rule of law which permits an accused to consent to the search of his room, then later claim that the consent did not extend to some of the contents of that room. Indeed, under such a rule, it would be equally illogical to hold that one could consent to a search of his person, but later claim that the consent did not extend to that particular pocket which was closed by a zipper; or to consent to a search of a vehicle and later claim the con-

---

6. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

7. *Id.* at 550, 88 S.Ct. at 1792.

sent did not extend to the glove compartment, which he opened only when asked to do so.

The findings of guilty and the sentence should be affirmed.